## BALTIMORE DRY DOCKS & SHIP BUILDING CO. v. NEW YORK & P. R. S. S. CO. et al.

### THE ISABELA.

(Circuit Court of Appeals, Fourth Circuit. November 6, 1919.)

No. 1748.

WHARVES ⬯16—RESERVATION OF FREE USE FOR "VESSELS BELONGING TO UNITED STATES."

Under a conveyance from the United States of a site for a dry dock, without other consideration than "the right to the use forever of said dry dock at any time for the prompt examination and repair of vessels belonging to the United States free from charge for docking," a privately owned vessel, requisitioned by the government for war purposes, taken over under a "bare boat" charter, and manned and operated by the Navy Department as an army transport, *held*, while in such use, to "belong" to the United States, and entitled to free docking.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Suit in admiralty by the Baltimore Dry Docks & Shipbuilding Company against the Steamship Isabela, the New York & Porto Rico Steamship Company, claimant, and the United States, intervener. From the decree (258 Fed. 934), libelant appeals. Affirmed.

Certiorari denied 251 U. S. ——, 40 Sup. Ct. 178, 64 L. Ed. ——.

This was a suit in admiralty, instituted in the District Court of the United States for the District of Maryland for libel of the steamship Isabela. The appellant, libelant below, is a corporation owning a dry docking and shipbuilding plant in the city of Baltimore, Md., consisting, among other property and structures, of two docks known as "Simpson Dry Docks," one of which is situated on property conveyed by the United States through the Secretary of War, under authority of an act of Congress approved June 19, 1878 (20 Stat. 167), entitled "An act granting a site for a dry dock in the city of Baltimore upon certain conditions." The other, which is the larger dock, is situated on property acquired from private owners. The conditions under which the ground for the first-mentioned dry dock was conveyed to the predecessor in title of appellant are set out in a deed from the Secretary of War, dated March 26, 1879, and are as follows:

"The consideration of this conveyance and the condition upon which same is being made being that the said Baltimore Dry Dock Company of Baltimore City is required to construct upon the land hereby conveyed within two years from the date of this conveyance an efficient Simpson improved dry dock 450 feet in length, and to accord to the United States the right to the use forever of the said dry dock at any time for the prompt examination, and repair of vessels belonging to the United States, free from charge for docking * * *."

This dock will be called for convenience the Ft. McHenry dock, and the larger dock of the appellant company, referred to, will be spoken of as the cross-street dock. Among other things, it appears: That the steamship Isabela, a vessel of 3,063 tons gross register, pursuant to the authority and directions embodied in the executive order of July 11, 1917, was requisitioned by the President, acting through the United States Shipping Board, for national uses and purposes. That after said requisition, the New York & Porto Rico Steamship Company, her chartered owners, executed the government's standard form of requisition charter. Said steamship was first taken over on the time basis, the terms thereof being contained under the form entitled

"time form" on pages 2, 3, and 4 of said requisition charter, but that on April 9, 1918, pursuant to the terms of the requisition, the steamship was taken over on the bare boat basis, the terms of which are defined under the title "bare boat" on pages 5 and 6 of said requisition charter. That on February 4, 1918, the said steamship was assigned for service of the War Department, and thereafter used as an army transport, and that on and after April 9, 1918, until the time of her redelivery to the chartered owners, she was employed in such service, and during said period, was manned by the United States through its Navy Department, with the officers and enlisted personnel of the navy, and said steamship, at the time of the rendering of the services mentioned in the libel, was in such service and so manned.

In the month of January, 1919, it appears that the appellant company received a letter from the Coast Inspector of the Naval Overseas Transportation Service, in which that officer states that he had deducted from bills rendered by the appellant company to the Naval Overseas Transportation Service for dry dock on three steamers, namely, the Soestdijk, the Norlina, and the Corozal, amounting to $3,960.85, on the ground that the dry dock located on the appellant's lower plant, which is the Ft. McHenry dock, could at any time be used for the prompt examination and repair of vessels belonging to the United States, free from charge for docking, and on the theory that the said vessels were "vessels belonging to the United States."

The appellant company at once protested against the deduction on the ground that these vessels did not belong to the United States, and the question was thereupon referred by the Naval Overseas Transportation Service to the Navy Department, and an opinion of the Solicitor of the Navy Department, dated January 21, 1919, was received in reply, the material parts of which opinion are: "That where vessels are under charter upon a bare boat basis for the sole use and benefit of the United States, either by the Shipping Board or any other department of the government, the equitable title therein is in the United States, the government having a special limited ownership in the vessels, and therefore such chartered vessels have the same free use of the lower dock of this company as other vessels of the United States."

In pursuance of this opinion, the said vessels being vessels under a bare boat charter to the Shipping Board, the Cost Inspector of the Navy refused to reinstate the charges. The earlier part of the Solicitor's opinion was concerned with the contention that vessels owned by the United States Shipping Board Emergency Fleet Corporation (although the learned Solicitor fails to distinguish between the Shipping Board and the Fleet Corporation, but evidently means the latter) could not be said to belong to the United States, and he proves to his own satisfaction that, as the United States owns 100 per cent. stock of said corporation, the United States has the sole use and benefit of said vessels, and they are, equitably at least, and under the provisions of the act of 1878, "vessels belonging to the United States." The appellant company in its letter of February 5, 1919, did not insist at the time on any exception it might have taken to the opinion on this point, but distinctly raised the further point that vessels under charter to the government, either through the Shipping Board or any other governmental agency, are not "vessels belonging to the United States," and are not entitled to free dockage.

The appellant company then requested that it be informed by the district supervisor of the Naval Overseas Transportation Service whenever an order was received to dry-dock a vessel, whether the vessel was a chartered vessel or one owned by the government. The district supervisor, Capt. Abele, accordingly on February 5, 1919, wrote to the appellant as follows: "Subject: Drydocking U. S. S. Isabela. I have to inform you that the Isabela is a government owned vessel under the ruling of the Solicitor of the Navy Department, dated 21st January, 1919. Title of ownership of this vessel rests with the Porto Rican Steamship Company" (sic?).

On receipt of this information the appellant on February 6, 1919, wrote a lengthy communication to Capt. Abele, in which they say, among other things: "We hereby refuse the free use of our dock for this privately owned

vessel and other privately owned vessels. We wish to emphasize that we are now willing, as we have always been, to carry out fully the use of the dock for vessels belonging to the United States. If the Navy Department desires this vessel docked, and orders us to do so, we shall, under protest, furnish the necessary facilities to dock the vessel, and for this service we claim the usual docking charges. If these charges are not paid by the Navy Department, we shall hold the ship and the owners of the ship responsible, and shall notify the owners to this effect." The letter contains, in addition, a measured protest against the threat on the part of he Navy Department therein referred to, to "commandeer" the dry dock, and undertook to suggest methods by which the controversy be determined promptly by the United States courts.

On February 7, 1919, Capt. Abele replied as follows: "The Baltimore Dry Docks & Shipbuilding Company, Baltimore, Maryland—Gentlemen: Subject: Dry-docking of U. S. S. Isabela. Reference: Your letter February 6th, relative docking of U. S. S. Isabela. It is hereby directed that the U. S. S. Isabela be docked in the lower dry dock of your company. This is to be considered an order for dry-docking in accordance with reference. Yours very truly, C. A. Abele, Captain, U. S. N."

Prior to receipt of the above order from Capt. Abele, the appellant company had written on February 6, 1919, to the New York & Porto Rico Steamship Company, New York City, inclosing a copy of their letter of the same date to Capt. Abele heretofore quoted. The day following receipt of order, to wit, February 8, 1919, they admitted the vessel to the dry dock, where she remained five days, incurring the dry-docking charge of 12 cents a ton for the first day and 10 cents each for the remaining four days, amounting altogether to $1,592.76. The bill for these charges was disapproved by the Cost Inspector of the United States Navy, as shown in his letter of February 13, 1919. The vessel was placed in dry dock by the government for the purpose of having her bottom scraped and being otherwise put in order for redelivery to her owner, the New York & Porto Rico Steamship Company, which redelivery took place on February 14, 1919, and the same day, she being then in the possession of private parties, the vessel was attached by the United States marshal on the order of the libelant, the appellant in this case.

The court below entered a decree dismissing the libel, from which decree libelant appealed to this court.

George Weems Williams, of Baltimore, Md. (Marbury, Gosnell & Williams, of Baltimore, Md., on the brief), for appellant.

George Forbes, of Baltimore, Md. (Ray Rood Allen, Fred A. Whitney, and Burlingham, Veeder, Masten & Fearey, all of New York City, on the brief), for appellee New York & Porto Rico S. S. Co.

Samuel K. Dennis, U. S. Atty., of Baltimore, Md., for the United States.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). The questions involved in this controversy are within a narrow compass; the main question being the proper interpretation to be given to the words "belonging to the United States." In order to correctly interpret the meaning of these words in the connection in which they are used, it becomes important to consider the circumstances which induced the government to make the grant it did. It must be admitted that, when this land was granted by the government for the purpose of drydocking, the government's only compensation therefor consisted in the use of the dry dock, free of charge; and it is but fair to assume that it was the purpose of the representatives of the government to at

least secure the free use of these dry docks for all ships being operated under its exclusive control.

As we have already stated, the Isabela was requisitioned by the government, assigned for the service of the War Department, and used as an army transport until her redelivery to her chartered owners. Its movements were controlled by the United States, through its Navy Department, under the supervision of its officers. Thus it will be seen that for the period in question, the Isabela was as much under the control and subject to the orders of the government as if it were actually owned by the government. These circumstances are material, and should be considered in ascertaining the correct interpretation to be given to the words "belonging to the United States."

The words "owned by" mean an absolute and unqualified title. The use of the words "belonging to" does not import that the whole title to the property or the thing is meant, because it frequently occurs in ordinary transactions that things may "belong to" one who has less than an unqualified and absolute title. Numerous instances in the ordinary transactions of life may be cited where this is true; for instance, where collateral is owned by the debtor and belongs to the creditor until the debt is paid. Also, premises occupied by the mortgagor until default; there the legal title is in the mortgagee, but the land "belongs to" the debtor until default. Bouvier's Law Dictionary contains the following definition of the word "belongs":

"To appertain to; to be the property of. Property belonging to a person has two general meanings: (1) Ownership; (2) the absolute right of user. A road may be said with perfect propriety to belong to a man who has the right to use it as of right, although the soil does not belong to him."

In the case of People v. Chicago Theological Seminary, 174 Ill. at page 182, 51 N. E. at page 199, the court said:

"We think this position is based upon a too limited meaning of the words 'belonging or appertaining' as here used. Of course, if the language of section five had been that the property, of whatever kind or description, owned by the Seminary shall be forever free from all taxation, etc., or if, as counsel seem to assume, the words 'belonging or appertaining' here necessarily meant ownership of the property, then there would be force in this argument of counsel. It is undoubtedly true that the word 'belonging' may mean ownership and very often does. But that is not its only meaning. * * *"

Counsel seem to have been unable to discover any admiralty cases in this country analogous to the one at bar. However, the courts of England have passed upon this point frequently. In the case of The Master, Wardens and Assistants of the Trinity Church v. Clark, 4 Maule & Selwyn's (1815-16) King's Bench Reports, 288, the court, speaking through Lord Ellenborough, said:

"Where defendant chartered his ship to the Commissioners of the transport service on behalf of the crown, to be employed as a transport, and the ship in the course of such employment made several voyages from Deptford to foreign ports and back, held that the terms of the charter party, coupled with the nature of the service, a temporary ownership passed to the crown, so that defendant during the time of such service, was not to be considered as owner within the charters granted to the Trinity House, which impose lighthouse duties, and for buoyage and the beaconage, on the masters and owners of ships."

After an elaborate discussion of the facts, the court, in concluding its judgments, said:

"The only question is, who is to be considered as owner of the vessel within the charters under which the plaintiffs claim, during the time she was in the service of the crown under this charter-party. We are of the opinion that from the terms of the contract, and from the nature of the service to be performed, the crown is to be so considered, and that a non-suit must be entered."

The following English cases are also very much in point: The Sarpen, [1916] Probate Division, Law Reports, 306; The Carrie, [1917] L. R. Probate Division, 224; Admiralty Commissioners v. Page and others, [1918] 2 Law Reports, King's Bench Div. 299; The Hopper No. 66, decision of Bargrave Deane, J., [1907] P. 34, and of Court of Appeals, 524; The Matti, [1918] Law Reports, Probate Division, ——.

Therefore we are of the opinion that the court below was correct when it said:

"The word 'belonging' is not a technical one; its meaning depends to a large extent upon the circumstances under which it is used. In common speech and understanding, something may well 'belong' to one, although he has less than an absolute and unqualified ownership of it."

In view of what we have said, we do not deem it necessary to enter into a discussion of the other points involved, feeling, as we do, that the decree of the court below was proper, and should be affirmed.

Affirmed.