MARK D. KEATING, d/b/a LIVINGSTON MOTOR COMPANY, Plaintiff and Respondent, *v.* UNIVERSAL UNDERWRITERS INSURANCE CO., Defendant and Appellant.

No. 9543.
Submitted November 13, 1957. Decided January 20, 1958.
320 Pac. (2d) 351.

Vilroy C. Miller, Livingston, Keller & Magnuson, Helena, Paul T. Keller, argued orally, for appellant.

Gibson & Berg, Livingston, Ben E. Berg, argued orally, for respondent.

THE HONORABLE PHILIP C. DUNCAN, District Judge, sitting in place of MR. JUSTICE BOTTOMLY:

This is an appeal from a judgment of the district court of Park County in favor of the plaintiff in an action brought to recover the sum of $2,541 resulting from defendant's denial of coverage of a loss on an automobile under a garage liability insurance policy wherein plaintiff is the insured and defendant is the insurer.

The case was tried upon an agreed statement of facts to the effect that:

Plaintiff is an Oldsmobile dealer and the operator of a repair shop and storage garage at Livingston, and defendant is conducting a general insurance business in Montana under proper authority;

On November 21, 1952, defendant issued to plaintiff a garage liability insurance policy, incorporated in full in the agreed statement of facts by way of attached exhibit thereto, (as are the bill of sale, promissory note and trust receipt hereinafter mentioned) having a period from November 22, 1952, to November 22, 1953, and which was in full force and effect on January 28, 1953, whereby defendant agreed by Coverage D "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property of others of a kind customarily left in charge of garages, including the loss of use thereof, caused by accidental collision or upset of such property while in charge

of the named insured in connection with his automobile dealer, repair shop, service station, storage garage or public parking place operations.'' but defendant provided for a number of exclusions from this coverage, two of such exclusions being:

''(a) to liability assumed by the insured under any contract or agreement except a warranty of goods or products;''

''(h) under coverage D, to injury or destruction caused directly by fire or theft; or to injury or destruction of (1) property owned or loaned or rented to the named insured, or (2) automobiles being driven or transported from the factory or other wholesale distributing point to the purchaser or for storage.''

On December 18, 1952, the Oldsmobile Division of General Motors Corporation executed and delivered to General Motors Acceptance Corporation a bill of sale covering a new 1953 Oldsmobile automobile, but the Acceptance Corporation never had possession of the automobile;

On January 2, 1953, the plaintiff executed and delivered to General Motors Acceptance Corporation his promissory note for $3,180.19 with interest at 4 per cent per annum payable on demand;

On January 7, 1953, the plaintiff executed and delivered to General Motors Acceptance Corporation a trust receipt acknowledging delivery and possession of the automobile under certain conditions and for certain purposes, including: that title thereto remains in the Acceptance Corporation as security until the note is fully paid; that the automobile is in possession of the plaintiff ''as his (its their) sole risk of all loss or injury for the purpose of storing and exhibiting same preliminary to and in procuring the sale thereof;'' that the automobile was not to be used or operated for demonstrating or otherwise without express permission of the Acceptance Corporation; that the automobile was not to be sold or otherwise disposed of until payment of the amount of the note;

Neither the bill of sale nor the promissory note nor the trust

receipt was ever filed or placed of record anywhere or at all in the State of Montana;

On January 7, 1953, upon execution of the note and trust receipt, the Oldsmobile Division of General Motors Corporation delivered to plaintiff the new automobile and he drove it to his place of business in Livingston where he stored, demonstrated and attempted to sell it;

On January 28, 1953, the automobile was wrecked in an upset while being driven, within the scope of his employment and as a proximate result of his negligence, by plaintiff's employee salesman who was returning the car to Livingston from White Sulphur Springs where he had driven and exhibited it for the purpose of procuring its sale at the direction of plaintiff but without permission of the General Motors Acceptance Corporation;

On January 29, 1953, plaintiff gave defendant written notice of the accident and loss, and on February 2, 1953, the General Motors Acceptance Corporation demanded of plaintiff that he pay the note; that defendant refused to pay for the damages done to the automobile on the grounds that such damages were not covered by the provisions of the garage liability insurance policy; that thereafter plaintiff amicably settled the note by paying to the General Motors Acceptance Corporation on February 13, 1953, the sum of $3,190, being the balance, principal and interest owing on the note; that the sum of $3,180.19 was the reasonable value of the automobile on January 28, 1953, immediately prior to the injury, and the reasonable salvage value of the car as wrecked on January 28, 1953, was the sum of $650, for which amount plaintiff sold the salvage to Overold Motors, Inc., Fargo, North Dakota.

Thus, the ultimate questions are whether the insured is responsible to General Motors Acceptance Corporation, independently of contractual liability, for loss of the car within the meaning of the insuring clause, ''To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of

property of others of a kind customarily left in charge of garages * * * caused by accidental collision or upset of such property while in charge of the named insured in connection with his automobile dealer * * * operations;'' and whether the automobile was ''property owned'' by plaintiff within the meaning of the exclusion clause of the insurance policy.

It will be observed from the statement of facts that the ▮▮▮▮ transaction that occurred between the Oldsmobile Division of General Motors, the General Motors Acceptance Corporation, and plaintiff automobile dealer constituted what has been described as a tripartite or true orthodox trust receipt transaction where the financier advances funds for the purchase of the chattel, purchases it and receives title to it from the manufacturer, and delivers possession to the dealer, who gives his trust receipt to the financier, and that it is not what is referred to as a bipartite trust receipt transaction where the dealer has title and gives his receipt to the financier. 89 C.J.S., page 698; 53 Am. Jur., Trust Receipts, section 2, pages 961, 962.

Much is said in the briefs of opposing counsel concerning the nature of the relationship between the parties created by the trust receipt transaction we have before us, that is, as to whether between the financier, the General Motors Acceptance Corporation, and plaintiff dealer there is a principal and agent, bailor and bailee, pledgor and pledgee, chattel mortgage, conditional sale, or some new independent relationship, upon all of which there appears to be a considerable diversity of opinion among the courts, even those of the same jurisdiction. Annotations in 49 A.L.R. 282, 87 A.L.R. 302, 101 A.L.R. 453, 168 A.L.R. 352.

The defendant urges the view that the transaction more closely resembles a chattel mortgage than anything else, but that under the Montana Uniform Trust Receipts Act, sections 65-201 through 65-219, R.C.M. 1947, it is not actually such nor a conditional sale or pledge, but a separate arrangement whereby all that the financier has is a security interest and title for all

purposes in dealing with third persons is in the trustee, the plaintiff here.

. The plaintiff distinguishes between the tripartite or true orthodox trust receipt transaction and the bipartite trust receipt transaction, and urges the view that since this one was tripartite the title never passed to the trustee plaintiff, and the relationship in this specific case is either that of conditional sale or bailment for sale, with title in either case remaining in the financier General Motors Acceptance Corporation.

Whichever may be the correct position, it appears that all of the cases cited as supporting one or the other involve creditors of or buyers from the trustee and some miscellaneous situations, and none of the cases cited, or which we have been able to discover, involve the first problem here posed, that is, whether or not the car was the "property of others" or "owned (by) the named insured" within the meaning of those phrases as employed in the insurance policy.

It has been held that the term "owner," when used alone, imports an absolute owner or one who has complete dominion over the property owned as the owner in fee of real property, Ramsey v. Leeper, 168 Okl. 43, 31 Pac. (2d) 852, 859, and that the words "owned by" mean an absolute and unqualified title, Baltimore Dry Docks & Ship Building Co. v. New York & P.R.S.S. Co., 4 Cir., 262 F. 485, 488. Whether such is the meaning of the phrases here in question, or if the meaning is varied according to the connection in which they are used, and they are to be understood according to the subject matter to which they relate, McFeters v. Pierson, 15 Colo. 201, 24 Pac. 1076, 22 Am. St. Rep. 388, it is certain, from the defendant's viewpoint alone, the phrases are at best generic and general and not specific and hence ambiguous and uncertain. The phrases are not defined in the insurance policy, nor is there any phraseology or conditions therein, nor is there anything in the facts submitted to this court from which may be inferred any qualified meaning, and, standing alone, we cannot say that these phrases were intended to exclude from the in-

surance coverage property possessed for sale only and to which the legal title resides in another, even though it be for security purposes alone.

Although it is true that in trust receipt transactions neither ██ the financier nor the manufacturer expect to receive the property back, it is also true that a cardinal object of such transactions is to enable the borrower to sell the goods in order to raise the money to pay the lender, Professor Bogert, Vol. 3, Univ. Chicago L. Rev., page 26, and the consequence is that while possession of the goods, during a portion of their life, may be in the dealer, it is fleeting and superficial. Trust receipt transactions never have for their object the vesting of ownership in the dealer. They are merely a method of financing the goods on their way from the manufacturer to the consumer. They are used very largely in financing of automobile dealers, 53 Am. Jur., Trust Receipts, section 1, page 961; A.L.R. annotations, supra, and it is a well-known fact of economic life, not only in Montana, but in the United States as a whole, that by far the greater proportion of retail automobile dealers finance their possession for marketing of new automobiles by trust receipts, or, as commonly called, "floor plans," and very few dealers do otherwise. This well-known fact must have been known to the defendant as an organization engaged in the business of writing and being the insurer in automobile garage liability policies, such as the one before us, specifically mentioning the plaintiff insured as an automobile dealer under "Coverage D," quoted supra. If the defendant insurer had intended to exclude "floored" automobiles from coverage, it would have been a simple matter for the insurer to have clearly and unequivocally provided therefor by the simple expedient of specifically referring to trust receipts and floor plans in the exclusion clause thereby removing all doubt. The law is plain that the ambiguity and uncertainty caused by the phrases in question must be resolved in favor of the plaintiff insured and against the defendant insurer. Johnson v. Continental Casualty Co., 127 Mont. 281, 263 Pac. (2d) 551. In this connection it

was said by this court in Montana Auto Finance Corp. v. British Etc. Underwriters, 72 Mont. 69, 75, 232 Pac. 198, 200, 36 A.L.R. 1495:

"It is a matter of common knowledge that insurance companies prepare their own contracts of insurance  *  *  * They do not permit the insured to have a voice in the drawing of his own contract; nor does he negotiate with reference to its terms in the sense that negotiations are carried on before agreements are reached in ordinary contracts. Joyce on Insurance, page 594. Policies of insurance are invariably complex and are understood by laymen with difficulty, and as a result the insured generally makes a request for the kind of insurance he desires and then signs 'on the dotted line' upon a formidable appearing printed form with the provisions of which the average assured has slight, if any, acquaintance. The policies are prepared by skilled lawyers retained by the insurance companies, who through years of study and practice have become expert upon insurance law, and are fully capable of drawing a contract which will restrict the scope of liability of the company with such clearness that the policy will be free from ambiguity, require no construction, but construe itself. Because of reasons such as these, whenever the contract of insurance is so drawn as to be ambiguous, uncertain, and to require construction, the courts of this country resolve the doubt in favor of the insured and against the insurer, in accordance with the rule *contra proferentem.*"

A further contention of defendant, in connection with the phrases just considered, is that the words of "Coverage D," "property of others of a kind customarily left in charge of garages, including the loss of use thereof," are only intended to apply to property of others (plaintiff's customers) brought to and left with the insured for service or repair or storage and then returned to such customers, and that they are not intended to apply to new cars in the hands of the insured for sale "and in which he has at least a beneficial interest, if not, as we shall later contend, the absolute ownership." The answer

to this contention in addition to that which has already been said, is that defendant has only partially quoted ''Coverage D,'' which is hereinbefore set out in full, and goes on to say ''While in charge of the named insured *in connection with his automobile dealer * * * operations.''*

Defendant's next contention is that plaintiff may not recover because of the exclusion, '' (a) to liability assumed by the insured under any contract or agreement except a warranty of goods or products.'' The trust receipt does state the plaintiff insured agrees that ''said property is in the possession of the trustee hereunder at his * * * sole risk of all loss or injury,'' but it does not necessarily follow that because of the written obligation on the part of the insured, the exclusion clause of the policy will govern instead of the insuring agreement. A conditional vendee or bailee assumes the full risk of loss or destruction of property left in his possession when the loss is due to the negligence of himself or his servants. Lacey v. Great Northern Ry., 70 Mont. 346, 225 Pac. 808, 38 A.L.R. 1331; Montana Leather Co. v Colwell, 96 Mont. 274, 30 Pac. (2d) 473. And there appears no good reason why this rule should not apply to the trustee under a trust receipt transaction. As stated in respondent's brief, ''Would it not be a strained construction of the policy to say that although the insured has a liability arising from the law, which the policy specifically covers in the insuring clause, the insurer is, nevertheless released from that liability because the insured has by contract acknowledged the same obligation at law? Obviously, such a construction of the policy would violate all the rules of construction laid down by this court for it would resolve the conflict between the insuring clause and the exclusion clause in favor of the insurer.''

Another contention of defendant is that since none of the documents involving the trust receipt transaction were filed or placed of record in Montana, the defendant is an innocent third party dealing with the plaintiff. We are not here dealing with an innocent purchaser or one who has extended

credit without knowledge of an existing but unrecorded encumbrance. All that is here involved is the interpretation of an insurance policy written to cover certain specific losses therein enumerated. Insofar as a construction of this policy is concerned, it makes absolutely no difference whether the particular trust receipt transaction documents were or were not placed of record, or whether General Motors Acceptance Corporation and plaintiff had filed a declaration that they were engaged in trust receipt transactions. In fact as to the particular trust receipt documents, they could not have been placed of record at the time of the issuance of the policy on November 22, 1952, for the first instrument, the bill of sale to the General Motors Acceptance Corporation, was not executed until December 18, 1952. As to the filing of a declaration, it must be remembered that the policy period ran from November 22, 1952, on into the future and until November 22, 1953. Whether or not the plaintiff was engaged in trust receipt transactions on November 22, 1952, defendant could very well have anticipated at the time of issuance that such might occur at any time during the life of the policy and provided against it, if that was to be the effect of the policy, all as heretofore commented on. And it might be pointed out that the Uniform Trust Receipts Act. section 65-213, subd. (4), R.C.M. 1947, provides protection for the entruster for any goods which have been, within 30 days previous to the filing of the declaration, the subject matter of a trust receipt transaction.

Defendant also argues that the effect of plaintiff's execution of the note prior to the execution of the trust receipt and delivery of possession of the car to plaintiff, and plaintiff's payment of the amount of the note show that plaintiff was the owner of the car. Despite the timing of the giving of the note and execution of the trust receipt and delivery of the car, it must be held on the facts before the court that all of these acts were only parts of one transaction constituting a tripartite trust receipt transaction with the note not constituting payment, but merely evidence of the indebtedness. Yale

Oil Corp. v. Sedlacek, 99 Mont. 411, 43 Pac. (2d) 887. There is nothing to warrant holding that the note discharged plaintiff's indebtedness to the General Motors Acceptance Corporation, but, even so, it is also true that under the Uniform Trust Receipts Act, supra, the execution of the trust receipt thereafter by plaintiff created a trust receipt relationship between plaintiff and the General Motors Acceptance Corporation, it being one of the purposes of the Act to make a bipartite trust receipt transaction as valid as a tripartite trust transaction. 89 C.J.S., page 698; 168 A.L.R. 360.

The discharge of the note by plaintiff on demand of the Acceptance Corporation represents the unpaid purchase price of the wrecked car, which is only the measure of damages as distinguished from the right of action sounding in tort which vested in General Motors Acceptance Corporation. Lacey v. Great Northern Ry., supra. Further, the defendant having denied coverage under the policy, it is in no position to criticize the settlement negotiations effected by plaintiff unless the amount paid in settlement is excessive, and that is not here claimed. Independent Milk & Cream Co. v. Aetna Life Ins. Co., 68 Mont. 152, 216 Pac. 1109; Annotation, 34 A.L.R. 739, 43 A.L.R. 928, 71 A.L.R. 1479.

The judgment is affirmed.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICES CASTLES, ANGSTMAN and ADAIR, concur.