BRITTINGHAM, Executrix of the Estate of John
William Brittingham, etc. *v.* THE TUGBOAT
UNDERWRITING SYNDICATE

[No. 415, September Term, 1970.]

*Decided May 12, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Raymond S. Smethurst, Jr.,* and *Henry M. Rutledge,* with whom were *Adkins, Potts & Smethurst* on the brief, for appellant.

*D. William Simpson,* with whom were *K. King Burnett* and *Webb, Burnett & Simpson* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The Arundel Corporation sued the estate of John William Brittingham (Brittingham), alleging in count one that it was owed rentals on a steel deck scow it had demised to him, in count two that Brittingham failed to repair and maintain the scow as the lease required, and in count three that Brittingham had converted the scow to his own use. Brittingham filed a counterclaim against Arundel alleging that the scow was unseaworthy, and a third party claim against The Tugboat Underwriting Syndicate (Syndicate), a reciprocal insurer, under Code (1968 Repl. Vol.), Art. 48A, Sub-title 18. The third party claim was that Syndicate on July 19, 1965, had insured Brittingham's diesel tug, the Kitty B, under a policy containing a tower's liability clause, but which contained a

typed exclusion which has led to this litigation, reading: "It is hereby understood and agreed that this policy excludes liability for loss, damage or expense to vessels in tow owned by the assured or affiliated or subsidiary companies or corporations."

The third party claim went on to allege that Arundel had sued Brittingham's executrix on the grounds that he had allowed the scow while under tow by the Kitty B to capsize and sink in Hooper Strait and that Syndicate had refused to defend, saying the scow was owned by Brittingham (as bareboat charterer) when it sank and the policy excluded coverage under these circumstances.

By agreement Brittingham dismissed the third party claim and Syndicate filed a proceeding for declaratory judgment to determine the coverage afforded by the policy. The parties stipulated the facts and, on motion by Syndicate, Judge Travers summarily declared Syndicate to have no obligation to defend Brittingham and no obligation to pay any judgment Arundel might recover against Brittingham.

John Brittingham had interests as a builder and operator of a building materials business. In July 1965 he bought the tug Kitty B for use in his businesses. He had not before owned or operated a tug or barge. One of his employees telephoned Syndicate to obtain insurance coverage on the Kitty B. He learned that the premium would be substantially less if the policy excluded other vessels owned by Brittingham while in tow by the Kitty B and took a policy with this exclusion to save money. Brittingham did not then own any vessel other than the tug. The next day Brittingham leased from Arundel, the steel-decked barge No. 227. After several earlier voyages, the Kitty B left Nasonville en route to Salisbury on July 23, 1965 with Barge 227, loaded with slag, in tow. Next morning the barge began to list and was pumped out several times during the day. Early in the morning of July 25 the barge overturned, casting the load of slag into the water. The Kitty B pushed the still floating barge onto a shoal where it was anchored and eventually sank.

Judge Travers ruled that the words "owned by" in the exclusion clause must be read to include a vessel possessed under a demise or bareboat charter. In contending that he was wrong, Brittingham says the critical words must be read in their plain, unambiguous, ordinary meaning and that they do not have a special meaning in maritime law and practice.

Brittingham concedes that the lease between Arundel and Brittingham, although in parol, was valid, *Pichirilo v. Guzman* (1st Cir.), 290 F. 2d 812, 813, *Rev'd on other grounds,* 369 U. S. 698, and that under the lease Brittingham had exclusive possession, command, control and navigation of the scow and therefore held under a demise or bareboat charter. *Marcardier v. The Chesapeake Insurance Co.,* 8 Cranch 39, 49, 3 L. Ed. 481, 484. He also agrees that it is well established that a bareboat charterer is for many purposes an owner during the demise and often, if not generally, is called the owner *pro hac vice.* Gilmore and Black, *The Law of Admiralty,* §§ 4-20 and 4-23 (1957) states that:

> "The demise, in practical effect and in important legal consequence, shifts the possession and control of the vessel from one person to another, just as the shoreside lease of real property shifts many of the incidents of ownership from lessor to lessee. * * * (p. 215)
> "[The demise is] an instrument for vesting in one person most of the incidents of ownership in a capital asset of [the shipping] business — the ship — while another retains the general ownership and the right of reversion. (p. 216)
> * * *
> "The most important consequences of the distinction between the demise and other forms of charters flow from the fact that the demise charterer is looked on as the owner of the vessel *pro hac vice.* * * *
> "[H]e qualifies as the 'owner' for purposes

of the statutes relating to limitation of liability * * *.

"The vessel, so far as third persons are concerned, is his vessel * * *." (p. 218)

Black's Law Dictionary (4th Ed.) defines *pro hac vice* as meaning: "For this turn; for this one particular occasion." An owner *pro hac vice* therefore is an owner for the "particular occasion" of the charter. The court put it well in *Vitozi v. Balboa Shipping Co.* (1st Cir.), 163 F. 2d 286, 289:

"In a charter of this kind in which the owner surrenders entire control and possession of the vessel and consequent control over its navigation to the charterer, the latter becomes what is called the owner pro hac vice. That is to say 'without any sale or purchase of the ship' the charterer becomes its owner for the term of the charter 'with the character or legal responsibility of ownership.' *Reed v. United States,* 11 Wall. 591, 600, 601, 78 U. S. 591, 600, 601, 20 L. Ed. 220. Differently expressed, the charterer under a demise charter party becomes the 'owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership.' "

See also *Leary v. United States,* 14 Wall. 607, 20 L. Ed. 756; *The Barnstable,* 181 U. S. 464, 45 L. Ed. 954; *Reed v. Steamship Yaka,* 373 U. S. 410, 412, 10 L.Ed.2d 448, 451; *Van Nood v. Federal Barge Lines, Inc.,* (E.D. La.), 282 F. Supp. 890, 892; *The Kaiser Wilhelm Der Grosse,* 106 F. 963, 969-970; *United States v. S.S. Lucie Schulte* (2nd Cir.), 343 F. 2d 897, 900.

It was held early that a contract of marine insurance is a maritime contract and the admiralty clause of the federal constitution brings it under federal jurisdiction. *The New England Marine Insurance Company v. Dunham,* 11 Wall. 1, 20 L. Ed. 90,

In *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U. S. 310, 313-314, 99 L. Ed. 337, 342-343, in deciding whether state law could control the construction of a maritime insurance contract, the Court reiterated the holding of *Dunham* and went on to say:

"But it does not follow * * * that every term in every maritime contract can only be controlled by some federally defined admiralty rule. In the field of maritime contracts as in that of maritime torts, the National Government has left much regulatory power in the States [particularly in relation to insurance contracts].

"Congress has not taken over the regulation of marine insurance contracts * * *. But this does not answer the questions presented, since in the absence of controlling Acts of Congress this Court has fashioned a large part of the existing rules that govern admiralty. And States can no more override such judicial rules validly fashioned than they can override Acts of Congress. * * *. Consequently [in deciding whether state law could control warranties in a marine insurance policy] the crucial questions in this case narrow down to these: (1) Is there a judicially established federal admiralty rule governing these warranties? (2) If not, should we fashion one?"

The authorities we have cited show there is a judicially established federal admiralty rule that a bareboat charterer is generally held to be an owner and we think, therefore, the term "owner" in a maritime insurance policy is not an ambiguous term and must be deemed to include not only a general or absolute owner but also an owner *pro hac vice* while he possesses and controls the vessel.

But, says Brittingham, the term "owner" is not used in the policy—the words used are "owned by," and he finds solace and support in the case of *Baltimore Dry*

*Docks & Ship Building Co. v. New York & P.R.S.S. Co.*, 262 F. 485. There the Circuit Court of Appeals for the Fourth Circuit in affirming Judge Rose, a great judge of the United States District Court for the District of Maryland, held that the words "belonging to" encompassed and included a ship possessed under a bareboat charter, but in passing said that the words "owned by" imported the meaning of absolute owner. We read this case as not merely a reed too slender to support Brittingham's contention but as supporting the opposite proposition. It arose and was decided in this wise: The Secretary of War, pursuant to congressional authorization, conveyed part of Fort McHenry to Baltimore Dry Docks in consideration of the right in the United States forever to use the dry dock "at any time for the prompt * * * repair of vessels belonging to the United States free from charge * * *." The government possessed the vessel Isabela under a bareboat charter and, in expectation of returning her to her absolute owner, put her in drydock. When repairs were complete, Baltimore Dry Docks claimed a charge for the dockage. In the District Court Judge Rose, in deciding for the government in the case reported in 258 F. 934, 935, sub nom. *The Isabela,* said of "belonging" what many courts have said of "owner":

> "The word 'belonging' is not a technical one. Its meaning depends to a large extent upon the circumstances under which it is used. In common speech and to ordinary understanding, something may well belong to one, although he has less than an absolute and unqualified ownership of it.
>
> "Occasionally, in the course of the last hundred years or more, English courts have had occasion to pass upon questions which were quite similar to that now under consideration. They concluded that, where a charter amounts to a demise of a ship, the charterer will be deemed the owner, so far as concerns his rights

and obligations to third parties, including the state. *Trinity House v. Clark,* 4 Maule & Selwyn, 288; *Sir John Jackson v. S.S. Blanche,* [1908] L.R. App. Cases, 126; *In re The Sarpen,* [1916] L.R. Probate, 312."

In affirming Judge Rose, the Circuit Court of Appeals made the statement that "the words 'owned by' mean an absolute and unqualified title" but it also quoted with approval part of Judge Rose's language that we set out above. In addition the Court found the words "belonging to" synonymous with a definition that included "ownership" and cited with approval and quoted from an old English case which Judge Rose had cited that held flatly that a bareboat charterer was an owner. The holding in *Baltimore Dry Docks* was that a vessel "belonging to" encompassed an owner *pro hac vice* and we cannot escape the notion that if one is an owner that which he owns is owned by him, and conclude that the necessary further holding of the case was that a vessel under a bareboat charter is owned by the charterer for the period of the demise. The Court's remark as to absolute ownership was an ipse dixit dictum that gratuitously made a distinction without a difference, as the opinion of the Court itself goes on to demonstrate.

The Maryland concept of the term "owner" does not differ from the approach taken in admiralty. In *Commercial Credit Corp. v. State,* 258 Md. 192, we held that the word "owner" in a statute included a conditional vendor and said at pp. 197-198 :

"In Black's Law Dictionary (4th ed. 1951) it is said that the term 'owner' is a *'nomen generalissimum,* and [that] its meaning is to be gathered from the connection in which it is used, and from the subject matter to which it is applied.' In *Weinberg v. Baltimore & Annapolis R.R.,* 200 Md. 160 (1952), Judge Collins for the Court, quoting from *B & O R.R. v. Walker,* 45 Ohio St. 577, 16 N. E. 475 (1888), said:

' "The terms 'owner' and 'owning' depend somewhat for their signification upon the connection in which they are used. 'To own' is defined, 'to hold as property; to have a legal or rightful title to; to have; to possess.' And an owner is 'one who owns; a rightful proprietor.' *An owner is not necessarily one owning the fee-simple, or one having in the property the highest estate it will admit of.* One having a lesser estate may be an owner, and, indeed, there may be different estates in the same property, vested in different persons, and each be an owner thereof." (Emphasis supplied.).' "

We noted too in *Commercial Credit* that in *Hagerstown v. Groh,* 101 Md. 560, we held that a mortgagee was an owner within the meaning of a condemnation statute and that in *Weinberg v. Baltimore and Annapolis Railroad Company,* 200 Md. 160, 167, we held that a lease which gave the B. and A. the right of termination should it "acquire its own bus terminal" came to an end when the railroad acquired a leasehold interest in "its own bus terminal." We held that the words "acquire its own bus terminal" meant that the railroad must become the owner of a terminal not necessarily in fee simple but by acquiring a limited or qualified estate or interest. See also *Hebron Savings Bank v. City of Salisbury,* 259 Md. 294, 299.

Our conclusion that the words "owned by" in Syndicate's policy include a vessel possessed under a bareboat charter under both admiralty law and Maryland law is strengthened by two additional factors. The exclusionary clause removes from coverage not only vessels in tow "owned by the assured" but those owned by "affiliated or subsidiary companies or corporations," which should bring to mind the contemplation that less than direct or absolute ownership was embraced by the clause. The second strengthening factor is that a greater risk would likely be insured against if the policy does not exclude

a bareboat charterer as an owner. If a tug damages a tow that belongs to another, a lien against the tug may result. To avoid the risk of such a lien, the tug owner can reasonably be expected to exercise much care. If the tug owner is, as bareboat charterer of the barge, an owner, no lien can jeopardize his ownership of the tug and in the second situation the tug owner may not be as careful.

The lesser cost of a policy with ownership exclusions would seem to reflect the lesser risk involved, but it would not do so fully unless "owned by" included an owner *pro hac vice.*

We think Judge Travers correctly decided the case and this conclusion obviates the need to consider whether or not under the facts there was a policy coverage, a question that both sides discussed.

*Order affirmed, with costs.*