COMMERCIAL CREDIT CORPORATION *v.* STATE OF MARYLAND

[No. 355, September Term, 1969.]

*Decided May 12, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Richard C. Whiteford,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, and *Sidney C. Miller, Jr.,* for appellant.

*H. Edgar Lentz, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Julian B. Stevens, Jr., State's Attorney for Anne Arundel County,* and *Raymond G. Thieme, Jr., Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

What to do with a gold (not solid) Cadillac is the problem thrust upon us in this appeal. Shall it be handed over to the appellant, Commercial Credit Corporation (CCC) which, as assignee of a conditional contract of sale, claims to be the "owner," or shall its present possessor, Anne

Arundel County, be allowed to declare it forfeited as provided by Code, Art. 27, § 301 (1967 Repl. Vol.)? The facts are not in dispute.

On 28 March 1968 Harold Leroy Scott (Scott) bought the Cadillac from Johnny's Used Cars (Johnny) for $5195, $1250 of which he paid in cash. Johnny promptly passed on the details of the transaction to CCC which provided financing for most of his sales. The customary credit investigation followed. CCC found Scott to be listed in the Baltimore telephone directory at the address given to Johnny. The Johns Hopkins School of Medicine confirmed the details of his employment, e.g., salary, position and length of service. A credit bureau reported no adverse information. CCC inquired of the Federal Narcotics Bureau whether Scott had any history of violation of the narcotics laws. The district supervisor replied that the "files of the Bureau of Narcotics, Baltimore, Maryland disclose[d] no criminal record or reputation of [Scott]" but he disclaimed any knowledge of the existence of such a record "with State or City officials, or whether such a record exists in other parts of the country."

The security agreement executed by Scott was assigned to CCC. The $5144.40 which CCC in turn paid to Johnny included a "finance charge" of $979.90; the stated monthly payment was $142.90. The agreement was recorded among the financing records of Baltimore City on 2 April 1968. The Department of Motor Vehicles issued its certificate of title, showing a conditional sale to CCC for $5144.40, to Scott on 15 April 1968. In the security agreement Scott agreed that he would not use the vehicle "for hire or *illegally*." The agreement provides that title "shall remain in Seller until all amounts owing * * * are fully paid in cash" and that if Scott "defaults on any obligation or breaches any agreement or warranty * * * Seller may * * * take possession of it."

It is stipulated that Scott was "fronting" for Edward Trogden when he bought the Cadillac and that Trogden had the exclusive use of it. The State Police arrested

Trogden in Anne Arundel County on 6 May 1968. They found narcotics in the car which he was driving at the time. As a result Trogden and Scott were convicted in the Circuit Court for Anne Arundel County of violating the narcotic laws. CCC had no knowledge of the use being made of the car which, it is agreed, is worth less than the amount due. If CCC did not become entitled to possession by virtue of the violation of the covenant not to make illegal use of the car it surely did become so entitled on 1 June 1968 when the payment due on that date was not paid. Only one payment was made, on 6 May, and that was 90 cents short of the actual amount due.

When CCC became aware of the intention of the State's Attorney to declare the vehicle forfeited it filed its petition in the Circuit Court praying a stay of the forfeiture and the return of the vehicle. The petition was dismissed with prejudice on 9 September 1969 after a hearing before the chancellor, Sachse, J.

## I.

The parties agree that there is presented for our consideration and decision a very "narrow issue," i.e., the meaning of "owner" as used in § 301; they agree also that until now we seem not to have considered the matter. The text of § 301 follows:

> "In addition to any other fines or penalties provided for a violation of the provisions of this subtitle, any motor vehicle or other vehicle, vessel or aircraft used or employed in the concealment, conveying or transporting of any such narcotic drugs, or used during the course of any violation of this subtitle by any person or persons convicted of the same, shall upon the conviction or convictions be declared by the court to be forfeited to the county or to Baltimore City, as the case may be; *provided that no vehicle shall be forfeited hereunder unless the owner thereof authorized or permitted such use or employment.* The county commissioners or the

mayor and city council of Baltimore at their discretion may use the said vehicle for public purposes or may exchange, sell or convey it to another person or persons; and any cash or moneys received therefor shall be added to the general funds of the county or City of Baltimore." (Emphasis added, see below.)

Section 301 first saw the light of day in March 1951. Known as Senate Bill 406 it was passed by that body without a dissenting vote and sent to the House of Delegates where it was amended, passed as amended and returned to the Senate. The Senate concurred in the amendment, the language of which is set out above in italics. Upon enactment it became Ch. 471 of the Laws of 1951. What sparked the amendment is, of course, beyond our ken because, as Chief Judge Hammond, for the Court, lately observed, in *Unsatisfied Claim and Judgment Fund v. Hamilton*, 256 Md. 56, 57 (1969), "in Maryland there usually is little prepassage evidence of intent." He noted a "gratifying" compensation, however, in that "the usual paucity of objective evidence leaves room for the exercise of judicial perceptiveness and perspicacity in determining intent."

Ch. 471 of the Laws of 1951 (§ 301, *supra*) added a new section to the Uniform Narcotic Drug Act which was enacted by Ch. 59 of the Laws of 1935, now Code, Art. 27, §§ 276-305 (1967 Repl. Vol.). That a forfeiture provision was not included in the Uniform Act may seem, at first blush, a little strange. It appears to have been so intended, however. According to a note to the Uniform Law "* * * it was deemed best that each state provide such methods for search, seizure and forfeiture as would best harmonize with its constitution and laws already enacted." 9B U.L.A. 411 (1966). But the need for deterring the use of motor vehicles in the drug traffic was not overlooked entirely. Section 291 of Art. 27 provides that "[a]ny * * * vehicle * * * which is resorted to by narcotic drug addicts for the purpose of using narcotic drugs or which is used for the illegal keeping or selling of the

same, shall be deemed a common nuisance. No person shall keep or maintain such a common nuisance." It seems fair to say that § 301 is aimed not at the innocent but at the guilty. Clearly it is intended to provide "[i]n addition to any other fines or penalties * * *" (e.g., §§ 291 and 300) a deterrent to the relentless and satanic traffic in addictive drugs. Equally clearly the proviso was inserted by the Legislature to preclude the confiscation of a vehicle whose owner neither "authorized [n]or permitted such use or employment."

## II.

The question whether a conditional vendor can be held to be an "owner" as the word is used in § 301 must now be dealt with. While, as we have noted, the question is novel to us, counsel have pointed to one *nisi prius* decision (Sherbow, J., in the Criminal Court of Baltimore, 1952) which, relying to some extent upon an unreported memorandum of an Assistant Attorney General, held that "the word 'owner' as used * * * [in § 301] includes the holders of conditional contracts of sale * * *" who had no knowledge of the unlawful use of the vehicles.

In Black's Law Dictionary (4th ed. 1951) it is said that the term "owner" is a *"nomen generalissimum,* and [that] its meaning is to be gathered from the connection in which it is used, and from the subject matter to which it is applied." In *Weinberg v. Baltimore & Annapolis R.R.,* 200 Md. 160 (1952), Judge Collins, for the Court, quoting from *B & O R.R. v. Walker,* 45 Ohio St. 577, 16 N. E. 475 (1888), said:

> " 'The terms "owner" and "owning" depend somewhat for their signification upon the connection in which they are used. "To own" is defined, "to hold as property; to have a legal or rightful title to; to have; to possess." And an owner is "one who owns; a rightful proprietor." *An owner is not necessarily one owning the fee-simple, or one having in the property the highest estate it will admit of.* One having a lesser

estate may be an owner, and, indeed, there may be different estates in the same property, vested in different persons, and each be an owner thereof.' (Emphasis supplied.) " *Id.* 200 Md. at 166.

In *Mayor & City Council v. Groh,* 101 Md. 560 (1905), we held that a mortgagee was an "owner" within the meaning of a local condemnation statute and as such entitled to damages for the taking of his interest. On the other hand, in *Alban Tractor Co., Inc. v. State Tax Comm'n,* 219 Md. 593 (1959), we held that "one who holds the legal title to tangible personal property only as security has never been, and is not now to be, taxed as an owner under the statutory scheme of taxation in this State." *Id.* at 599. But in *Weinberg v. Baltimore & Annapolis R.R., supra,* a lease which gave the railroad the right to terminate it before the end of the term should it "acquire its own bus terminal" was held to have come to an end despite the fact that it acquired only a leasehold interest in "its own bus terminal." We held that the words " 'acquire its own bus terminal' mean that the railroad must become the owner of the bus terminal, not necessarily in fee simple but by ownership of an interest or estate therein as here acquired * * *." *Id.* at 167. In this regard, it should be noted that § 301 does not specify the kind of interest one must own to be protected from a forfeiture.

What Judge Horney, for the Court, said in *Huettner v. Savings Bank of Baltimore,* 242 Md. 477 (1966), seems especially applicable here. He said that where there is a conditional sales contract "possession * * * [is] delivered to the buyer but title and *general ownership* * * * [remain] in the seller, or the * * * *assignee,* pending payment of the purchase price by the buyer * * *." *Id.* at 481 (emphasis added). *See Beckwith Mach. Co. v. Matthews,* 190 Md. 182 (1948) ; and 41 Op. Att. Gen. 115, 118 (1956). He said also in *Huettner* that "[t]he certificate of title issued by the D.M.V. is not a warrant of absolute ownership but is merely an indicia of ownership, which, like possession, may be rebutted by other evidence." *Id.* at 481-82. The certificate in the instant case,

of course, bears the notation that CCC holds a lien on the Cadillac.

We think the Legislature intended the proviso to embrace innocent conditional vendors. Whether the assignees of all conditional vendors, in any and all circumstances, also were meant to be protected against forfeiture we are not now called upon to say and it should be understood that we refrain from so holding. Given the circumstances of the instant case, however, we see no reason why the fact that CCC is technically Johnny's assignee should deprive it of immunity from forfeiture. *Huettner v. Savings Bank of Baltimore, supra.* After all, without its money Scott could not have bought the car. Johnny has no stake in it and Scott has forfeited whatever interest he may have had. CCC is the only one left with any real ownership in the car.

## III.

Before looking around to see what has happened in other jurisdictions it ought, perhaps, to be recalled that forfeitures are odious. In 37 C.J.S., *Forfeitures* § 4 (b) at 8-9 (1943), it is said:

> "Forfeitures are not favored; they are considered harsh extractions, odious, and to be avoided when possible. Statutes designed to relieve from the rigors of forfeiture are looked on warmly and construed liberally, so as to afford the maximum relief, and where a liberal construction of a statute will avoid the imposition of a forfeiture it will be so construed. * * * For a statute to be construed so as to produce a forfeiture, its language must clearly show an intent to do so; forfeitures are never to be inferred from doubtful language."

*See* 36 Am.Jur.2d, *Forfeitures and Penalties* § 8 (1968); and 3 J. Sutherland, *Statutory Construction* §§ 603-06 (3d ed. 1943). *See also Ordway v. Central Nat'l Bank,* 47 Md. 217, 241 (1877).

The federal government and approximately twenty-

four states, including Maryland, have vehicle forfeiture sanctions in their narcotics laws. *See* Note, *Forfeiture of Innocent Lienor's Interest Where Automobile Used In Violation Of Narcotic Laws,* 44 Ia. L. Rev. 598, 599 (1959). A survey of the state forfeiture statutes indicates that a substantial majority differentiate between the interests of an innocent "owner" and "lienor" and protection is provided for both. *See, e.g.,* Del. Code Ann. Tit. 11, § 2325 (1953). The statutes of at least two states are silent in respect of what, if any, interest will be protected against forfeiture. *See* Mont. Rev. Codes Ann. § 54-112 to § 54-118 (1961); and N.C. Gen. Stat. § 90-111.2 (1965). The Nebraska statute, on the other hand, states that purchasers of vehicles sold upon forfeiture "shall take title thereto free and clear of all rights * * * title and interest of all persons claiming to be owners thereof or to have liens thereon." Neb. Rev. Stat. § 28-472.01 (1969).

There appear to be at least three forfeiture statutes, besides Maryland's, which protect against confiscation only the interests of innocent "owners." [1] The federal statute providing for the forfeiture of vehicles used to transport or conceal narcotics exempts only the interest of an innocent common carrier and an "owner * * * [whose] vehicle was unlawfully in the possession of a person who acquired possession thereof in violation of the criminal laws of the United States, or of any State." [2] 49 U.S.C., § 782 (1963). The federal courts have uniformly held that the holder of a security interest is not an "owner" within the meaning of the above quoted lan-

---

1. It is interesting to note that the New Mexico forfeiture statute, which formerly protected only the interest of the "person owning such vehicle * * * [who] did not know * * * [or] could not have known" or its illegal use (Ch. 145, § 27 [1935] N.M. Laws), now provides protection against confiscating the interest of any innocent "legal or registered owner." N.M. Stat. Ann. § 54-7-26 (1969 Supp.).

2. The Maryland statute, of course, exempts the interest of an "owner" who has not "authorized or permitted" the vehicle to be used illegally and would thus seem to protect a larger number of persons than the federal statute. Code, Art. 27, § 301 (1967 Repl. Vol.).

guage and is thus not entitled to a judicial remission of the penalty. *See, e.g., General Finance Corp. v. U. S.*, 333 F. 2d 681 (5th Cir. 1964). It should be noted, however, that an innocent lienholder is not without a remedy. He may obtain administrative relief from forfeiture by applying to the Secretary of the Treasury. 19 U.S.C., § 1618 (1965). The federal statutes are discussed in Note, *Forfeiture of Property Used in Illegal Acts*, 38 N. D. Law. 727 (1963).

The New York statute provides that the property subject to forfeiture may be returned "to the owner thereof" if "the ends of justice require * * * it." N. Y. Pub. Health Law § 3353 (4) (1954). In *City of Buffalo v. Brooks*, 3 Misc. 2d 492, 155 N.Y.S.2d 758, *opinion clarified*, 3 Misc. 2d 875, 157 N.Y.S.2d 646 (Sup. Ct. 1956), *aff'd*, 5 App. Div. 2d 752, 169 N.Y.S.2d 447 (1957), the court, commenting on the City's argument that the statute was intended only to exempt owners in possession and not innocent conditional vendors, said:

> "We cannot ascribe such a strict, narrow and strained interpretation to a remedial statute. If we exclude those in that category as entitled to relief upon good cause shown, it is difficult to understand to whom the benefits of the statute are available.
>
> "It is a matter of common knowledge that a high percentage of automobiles sold are financed by conditional sales contract. Surely the legislature was not unaware of that which was and is common knowledge. It did not intend to enact legislation that could seriously impede or obstruct the usual outlets of the automobile business."
>
> * * *
>
> "I hold that a conditional vendor is an owner and not a lienor within the meaning of the statute under discussion." *Id.* 155 N.Y.S.2d at 763.

The Rhode Island statute exempts from forfeiture the

interest of "any person owning such vehicle * * * [who] did not know and * * * by the exercise of due diligence could not have known" of the vehicle's illegal use. R.I. Gen. Stat. § 21-28-39 (1968). At this writing the statute seems not to have been construed.

The forfeiture of vehicles is not confined to violations of the narcotics laws. A number of states (not including Maryland) and the federal government have enacted statutes to deter the use of motor vehicles in connection with violations of the liquor laws. Several of these statutes contain clauses exempting from forfeiture the interests of innocent "owners" only. The decisions dealing with the question whether the innocent lienholder is protected by such statutes are not in agreement. Those cases which hold that the statute does protect the lienholder seem to proceed upon one or the other of two theories: (1) the legislature intended that the statute protect all innocent persons; see *General Motors Acceptance Corp. v. State,* 12 S.W.2d 968 (Tex. 1929); and *West Barnes Motor Co. v. State,* 95 So. 675 (Miss. 1923); see also *Shrouder v. Sweat,* 96 S. E. 881 (Ga. 1918); and *State v. Jones-Hansen-Cadillac,* 172 N. W. 36 (Neb. 1919); (2) the lienholder became an "owner" prior to forfeiture because a provision of the security agreement was breached when the vehicle was illegally used; see *Naylor v. Simmons,* 194 P. 94 (Idaho 1920) and *Seignious v. Limehouse,* 93 S. E. 193 (S.C. 1917). The latter theory can, of course, be employed in the case at bar since, as we observed early on, the security agreement provides that the "[p]urchaser agrees * * * not to * * * use [the vehicle] * * * illegally" and that "[i]f [the] purchaser defaults on any obligation or breaches any agreement * * * under this contract, [the] Seller may lawfully enter any premises where vehicle may be found and take possession of it." The argument might have been made (it was not) that CCC became the veritable "owner" of the Cadillac upon its being used illegally, thereby completely obviating the need for divining the intention of the Legislature.

Those cases which reject the first theory appear to

place great emphasis upon the notion that a lienor is not an "owner" within the generally accepted sense of the word and thus the statute should not be construed so as to protect the lienor's interest. *See Commonwealth v. Bowers,* 304 Pa. 253, 155 A. 605 (1931) ; and *State v. One Pontiac Coach Automobile,* 55 S. D. 8, 224 N. W. 176 (1929). The second theory was rejected by the court in *Commonwealth v. One Five Passenger Overland Sedan,* 90 Pa. Super. 376 (1927) because: (1) "the vehicle became subject to forfeiture at the same time the * * * [lienor's] right of possession arose, and the claim of the Commonwealth is paramount" (*Id.* at 382) ; and (2) to adopt the "ownership because of breach" theory would frustrate the operation and effect of the forfeiture statute. *See also State v. One Studebaker Automobile,* 50 S. D. 408, 210 N. W. 194 (1926). Cases interpreting vehicle forfeiture statutes employed to deter violations of liquor laws are collected and discussed in 14 A.L.R.3d 221 (1967).

Of the various approaches noted above, the one employed in *City of Buffalo v. Brooks, supra,* seems to us to be persuasive and, of course, it is in line with our own thinking. As has been said, forfeiture statutes should be construed liberally in favor of the claimant. Such a construction, of course, should be consistent with the purpose of the statute. The purpose of Code, Art. 27, § 301, *supra,* is to deter violations of the narcotics laws but not at the expense of innocent persons. It must be assumed that "the legislature was not unaware of that which was and is common knowledge [and that it] * * * did not intend to enact legislation that could seriously impede or obstruct the usual outlets of the automobile business." [3] *City of*

---

3. It is notable that in 1950 (one year prior to the enactment of the Maryland forfeiture statute) 47% of all passenger car sales were accomplished with a conditional sales contract or with borrowed money. The figure climbed to 58% by 1968. It is even more interesting to note that 46% of new car sales in 1950 were financed as opposed to 69% by 1968. U.S. Dept. of Commerce, *Statistical Abstract of the United States* 552 (90th ed. 1969).

*Buffalo v. Brooks, supra.* A contrary assumption would surely be unreasonable.[4]

> *Decree reversed.*
> *Case remanded for the passage of a decree conformable with the views expressed in this opinion.*
> *Appellee to pay the costs.*

NOTE: Two days after this opinion was filed it came to our attention that the Legislature on 31 March, the last day of its 1970 session, enacted Senate Bill 883, repealing §§ 276 through 313D of Article 27 and substituting in lieu thereof §§ 276 through 302, under the new subheading "Health—Controlled Dangerous Substances." The bill, sponsored by the Legislative Council, was introduced on 20 March. Signed by the Governor on 28 April, it became Chapter 403 of the Laws of Maryland of 1970. The effective date is 1 July 1970. It is said to be "a comprehensive revision [of all laws concerning drugs] patterned after the suggested legislation proposed by the [U. S.] Department of Justice."

Although the case was argued on the day (1 April) following the passage of Senate Bill 883 by the Legislature, counsel did not refer to the fact. It will be observed that Chap. 403 makes what seems to be a significant change in the provisions relating to forfeitures.

---

4. Professors Hart and Sacks suggest that in determining what purpose ought to be attributed to a statute, "[t]he statute ought always to be presumed to be the work of reasonable men pursuing reasonable purposes reasonably unless the contrary is made unmistakably to appear." H. Hart, Jr. and A. Sacks, *The Legal Process* 1157 (1958).