633 A.2d 410

**Algia FORD, III**

v.

**GENERAL MOTORS ACCEPTANCE CORPORATION.**

**No. 1990, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Dec. 1, 1993.

Edward Smith, Jr. (Cummings, Smith & Dashiell, P.A., on the brief), Baltimore, for appellant.

Lisa Walker Justis (Steven K. Fedder, David R. Sonnenberg, Louise D. Williams and Weinberg and Green, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and MOYLAN and DAVIS, JJ.

WILNER, Chief Judge.

Appellant filed suit in the Circuit Court for Baltimore City against appellee, General Motors Acceptance Corporation (GMAC), claiming that GMAC had wrongfully repossessed appellant's truck. He sought both money damages for the wrongful conduct to date and an order staying any sale of the vehicle. On GMAC's motion, the court dismissed the complaint for failure to state a claim upon which relief could be granted, and appellant has filed this appeal.

Regrettably, the record is somewhat thin as to all of the essential underlying facts. We do know this much. In July, 1990, appellant purchased a 1990 Nissan Pathfinder truck and financed part of the purchase price with GMAC. The financing was evidenced by a Retail Installment Sales Contract signed by appellant and GMAC. The section of that contract dealing with repossession provided, in relevant part:

> "Repossession means that, if you fail to pay according to the payment schedule or if you break any of the agreements in this contract (default), *or if the vehicle is seized by the police,* the Creditor can take the vehicle from you. To take the vehicle the Creditor can enter your property, or the property where it is stored, so long as it is done peacefully.

> .  .  .  .  .

> If the Creditor repossesses the vehicle, you have the right to get it back (redeem) at any time before it is sold, *unless the vehicle was seized by the police.*"

(Emphasis added).

On May 30, 1991, appellant lent the vehicle to his girlfriend, Laurenea Nias. Ms. Nias, in turn, picked up a passenger. Officers of the Baltimore City Police and the Federal Drug Enforcement Agency, having apparently been previously informed that this passenger would be carrying drugs, stopped the car, searched the passenger, and found the drugs in his tennis shoe. With Ms. Nias's consent, the officers also

searched the truck but found no other controlled substance. Ms. Nias was not charged, but, presumably because an occupant of the vehicle had been found in possession of the contraband, the officers seized the vehicle and had it transported to an impound lot.

GMAC was informed of the seizure by DEA; it elected then to exercise its right under the contract to repossess the vehicle and, on August 19, 1991, notified appellant that unless he paid the accelerated balance of $15,176·by September 6, 1991, the truck would be sold. Through letters from his attorney, appellant protested, pointing out, first to GMAC and later to its attorney, that all payments under the contract were current and that he was totally innocent in the matter. In his September 3 letter to GMAC's lawyer, counsel averred that appellant had lent the truck to his girlfriend who, herself, had no knowledge that the passenger was carrying drugs. Asserting the lack of any evidence that Ms. Nias was in any way involved in illegal activity or was acting as appellant's agent, he demanded the return of the vehicle. When GMAC ignored that demand, appellant brought this suit seeking, as we indicated, an order staying any sale of the truck and damages.

In its motion to dismiss, GMAC informed the court that, as appellant had failed to redeem the vehicle in accordance with the August 19 notice, the car had been sold. In support of its contractual right to repossess and sell goods seized by the police, GMAC cited Md.Code.Comm.Law art., § 12–624(a), authorizing the holder of a retail installment sales contract to repossess goods sold under the contract if "[t]he goods were seized by a police department, bureau, or force," and § 12–625(d), declaring that no right of redemption existed in goods that were so seized. GMAC stands by that position in this appeal—that it acted pursuant to contractual powers that were, in turn, specifically authorized by the Legislature as part of the Retail Installment Sales Act.

Appellant counters that § 12–624 of the Commercial Law article must be read in conjunction with § 297 of art. 27, which provides for, but establishes certain conditions to, the seizure

and forfeiture of vehicles (and other property) used in connection with controlled dangerous substances. One of those conditions is that a vehicle shall not be seized and recommended for forfeiture when it appears that an innocent owner has lent the vehicle to another and that person or someone invited by that person causes controlled substances to be brought into the vehicle without the owner's knowledge. A harmonic reading of the two statutes, he avers, leads to the conclusion that, unless the buyer is otherwise in default under the agreement, the right of repossession given in § 12–624 does not apply to an "innocent owner."

Implicit in appellant's argument is the assumption that, absent statutory authorization for a creditor to repossess solely upon a seizure by the police, any such provision in a retail installment sales contract would be unlawful. GMAC has taken no issue with that assumption, and, indeed, we think it is a fair and accurate one.

The Retail Installment Sales Act is remedial in nature and was intended "to curb serious actual or potential evils." *Hudson v. Md. State Housing Co.*, 207 Md. 320, 331, 114 A.2d 421 (1955). It provides extensive regulation of that form of marketing, including, in § 12–624, specifying the events and circumstances under which a creditor is entitled to repossess the goods sold. Prior to the addition in 1984 of the language allowing repossession when the goods were "seized" by a police agency, there was no suggestion that a contract subject to that Act could permit repossession solely on that account. We hold, therefore, that the authority provided in the contract must be read *in pari materia* with § 12–624, and that the contractual authority cannot extend beyond the statutory authority.

The question presented to us by appellant is thus a very limited one of statutory construction—the meaning of the word "seized" in §§ 12–624 and 12–625.

The fundamental rules of statutory construction have been recited many times by the Court of Appeals. A fair and

recent summary is provided in *Motor Vehicle Admin. v. Shrader*, 324 Md. 454, 462–63, 597 A.2d 939 (1991):

"The cardinal rule of statutory construction is to ascertain and effectuate legislative intent. . . . Because the language of the statute is the primary source of legislative intent . . . the words of the statute must be given their ordinary and natural meaning. . . .

On the other hand, the plain meaning rule is not rigid and does not force us to read legislative provisions in rote fashion and in isolation. . . . One equally well-settled principle of statutory interpretation is that a statute is to be construed reasonably with reference to the purpose, aim or policy of the legislature reflected in the statute. . . . Additionally, a statute must be construed in context; '[t]he "meaning of the plainest language" is controlled by the context in which it appears'. . . . Thus, when construing a provision that is part of a single statutory scheme, the legislative intent must be gleaned from the entire statute, rather than from only one part. . . . Also, legislative reports and other pertinent legislative history may help to provide the appropriate context."

(Citations omitted.)

In furtherance of this general policy of effectuating legislative intent, it is also a paramount principle of statutory construction that "two statutes that relate to the same subject matter will be harmonized to the fullest possible extent." *Biggus v. Ford Motor Credit Co.*, 328 Md. 188, 208, 613 A.2d 986 (1992).

GMAC's position is simplicity itself. The Retail Installment Sales Act (§ 12–624) says that a holder may repossess goods sold under an installment sales contract if the goods have been "seized" by a police agency; words used in a statute are given their ordinary common meaning; "seized" means "seized" and nothing more; appellant's truck was "seized" by a police agency; therefore, GMAC was entitled to exercise its contractual right to repossess the vehicle. Indeed, at oral argument, GMAC insisted that it was authorized to repossess and sell a

vehicle, without any right of redemption, even if the vehicle was impounded because it had broken down and was obstructing traffic or because it was illegally parked.

GMAC's argument, we think, is much too simplistic, for it ignores the fact that the authorization in § 12–624 relied upon by GMAC was enacted as part of a statute dealing more generally with the seizure and forfeiture of vehicles, a statute that rewrote part of art. 27, § 297 as well. The two Code provisions are closely connected and have to be read in harmony. We cannot just look at § 12–624 and stop, as GMAC urges.

There is, indeed, a good bit of legislative history with respect to the seizure and forfeiture of vehicles allegedly used in connection with illegal drug transactions, and it is from that history that the evident legislative intent emerges.

In 1951, the General Assembly first entered these waters by enacting a statute (1951 Code art. 27, § 352A) providing that any vehicle used in the transportation of illegal narcotic drugs or used during the violation of the narcotic drug laws, upon conviction of the violator, shall be declared forfeited to the county. There was a proviso, however, that "no vehicle shall be forfeited hereunder unless the owner thereof authorized or permitted such use or employment."

In *Commercial Credit Corp. v. State*, 258 Md. 192, 265 A.2d 748 (1970), the question arose whether the assignee of a vendor under a conditional sales contract could be considered as an "owner" for purposes of the exemption. The actual owner of the car purchased it for use by another person in the illegal drug trade. He financed the purchase through a conditional sales contract that the seller assigned to Commercial Credit. In the contract, the buyer agreed not to use the car illegally. When the user of the vehicle was arrested and convicted for violating the drug laws, the county moved to have the car forfeited. The owner was, by then, behind in his monthly payments, and Commercial Credit filed a petition to stay the forfeiture and have the car returned to it.

The issue before the Court, as we indicated, was whether Commercial Credit could be considered an innocent "owner," for it was clear that the actual owner was anything but innocent. Noting that, unlike some other States, Maryland's statute did not expressly protect innocent lienholders directly, the Court nonetheless gave an expansive meaning to the word "owner." It observed, at 203, 265 A.2d 748, that the purpose of the law was to deter violations of the narcotics laws, "but not at the expense of innocent persons," and that the Legislature did not intend "to enact legislation that could seriously impede or obstruct the usual outlets of the automobile business." Any contrary assumption, it declared, "would surely be unreasonable." *Id.* at 204, 265 A.2d 748. Largely on that basis, but noting as well that, as the lien on the car exceeded its value Commercial Credit was the only entity with any real economic interest in the vehicle, the Court held that Commercial Credit was an "owner" within the meaning of the proviso and was therefore entitled to possession of the car.

While the *Commercial Credit* case was pending in the Court of Appeals, the Legislature, through 1970 Md.Laws, ch. 403, rewrote the controlled dangerous substance law and, with it, the provision dealing with forfeitures.[1] It did not, however, address the problem of an innocent lienholder, and, indeed, significantly circumscribed the "innocent owner" provision enacted in 1951. In new § 297 added to art. 27, the General Assembly declared that all "conveyances" used or intended for use to transport controlled dangerous substances were subject to forfeiture "and no property right shall exist in them." There were two exceptions to that provision: a conveyance was not subject to forfeiture if (1) it was used by a person as a common carrier, unless it appeared that the owner "or other person in charge of such conveyance" was a consenting party or was privy to a violation; or (2) the violation was committed by a person other than the owner while the conveyance was

---

1. The 1970 Act was passed two days after the Court filed its Opinion in *Commercial Credit.* The Court was apparently unaware of the pendency of the legislation. *See* Note, 258 Md. at 204, 265 A.2d 748.

"unlawfully" in the possession of that other person in violation of State or Federal criminal law.

The 1970 statute came before the Court in *Pr. George's Co. v. Blue Bird Cab,* 263 Md. 655, 284 A.2d 203 (1971). The cab company had leased one of its cabs to a driver named Gray. The lease was for a year but required a daily rental of $16, payable each day. Gray was arrested for selling drugs from the cab, and the county seized the vehicle pursuant to § 297. The cab company, claiming under the two exemptions, petitioned for release, which the circuit court granted. The Court of Appeals reversed. It held first that "under the applicable statute at the time of this seizure, lack of complicity by the owner, unless rescued by the stated exceptions in the law, is not a defense and in fact it makes no difference whether there is any conviction of a crime related to those seized goods." *Id.* at 659, 284 A.2d 203. It then rejected the argument that either exemption applied under the facts of the case. The culpable party—Gray—was "in charge" of the cab, but, although his conduct was illegal, his possession of the cab was not in violation of any criminal law.

The Legislature responded swiftly to *Blue Bird,* but not in a way that was of much assistance to lienholders. The focus, rather, was on innocent *owners.* By 1972 Md.Laws, ch. 659, it added a number of new subsections to § 297 to "provide certain guidelines and procedures for the seizure and forfeiture of motor vehicles" used in violation of the controlled substance laws.

The major features of the 1972 law were to draw a clear distinction between the seizure and the forfeiture of motor vehicles and the forfeiture of other kinds of property, to distinguish between the process for seizing a vehicle and that of forfeiting it, and to protect an innocent owner of a motor vehicle with respect to both seizure and forfeiture. The seizure and forfeiture of "conveyances," including vehicles, was dealt with generally in subsections (a) through (d) of § 297. The 1972 law added additional subsections (f) through (w) dealing specifically with the seizure and forfeiture of motor

vehicles. Seizure was effected by the police; they were *directed* in new subsection (f) to seize motor vehicles and recommend their forfeiture in three situations: (1) where controlled substances in any amount are sold or attempted to be sold; (2) where controlled substances or paraphernalia are found which would reasonably indicate that a sale was contemplated; or (3) where, applying certain enumerated guidelines, the total circumstances "dictate that seizure and forfeiture is justified."

Following the seizure of a vehicle, the chief of the police agency was to review the facts and circumstances and decide whether to recommend to the State's Attorney forfeiture of the vehicle. The State's Attorney was then directed by subsection (j) to make an independent decision whether to proceed with a forfeiture and, if he decided to proceed, to file a petition with the circuit court. Procedures were established for notice to the owner and the opportunity for a hearing.

Subsection (f), after specifying the circumstances under which a vehicle was to be seized and recommended for forfeiture, set forth three circumstances under which a motor vehicle used in violation of the subtitle *"shall not be seized and forfeiture shall not be recommended to the State's Attorney."* (Emphasis added.) One of those circumstances (subsection (f)(2)(ii)) was where "an innocent registered owner lends his motor vehicle to another and the latter or someone invited into the motor vehicle by such person causes controlled dangerous substances or paraphernalia to be brought into the vehicle without the knowledge of the owner." If, in making his independent determination, the State's Attorney concluded that the vehicle fell within one of the three exempted circumstances, "he shall surrender the vehicle upon request to the owner." § 297(i).

There can be little doubt that, through the enactment of these provisions, the Legislature effectively restored to innocent owners the protection initially afforded by the 1951 proviso that had been repealed in 1970. It also afforded some protection to innocent lienholders, although how much is not

at all clear. It will be recalled that, in *Commercial Credit,* the Court, in construing the 1951 law, equated a lienholder (and even the assignee of a lienholder) with an owner, thereby affording an innocent lienholder an exemption from forfeiture not available, in that case, to the actual owner. In § 297(g) added by the 1972 Act, the Legislature directed that, upon seizure and a recommendation of forfeiture, the State's Attorney was to notify the Motor Vehicle Administrator of the seizure, informing him as well of the serial number of the vehicle. The Administrator was required then to certify to the State's Attorney "the name and address of the owner." The subsection concluded with the statement that "[t]he term 'owner' *in this subtitle* includes lienholder as well as owner . . . ." (Emphasis added.)

Whether the General Assembly intended by that last provision to codify the ruling in *Commercial Credit* is not at all clear. It was buried in a subsection dealing solely with information to be provided to the State's Attorney, but it purported to make the expanded definition of "owner" applicable to the entire subtitle, which, at the very least, would include all of § 297. On the other hand, in subsection (r) the Legislature declared that, if a court determined that a vehicle was to be forfeited and that it was subject to a bona fide recorded security interest created without the knowledge that the vehicle was to be used in violation of the subtitle, "the court shall order that the motor vehicle be sold by the State." After defraying the costs of the forfeiture and sale, the proceeds were to be applied to any lien on the vehicle. Those provisions in subsection (r) indicate that the only protection that a lienholder actually had was the right to be paid before any proceeds were turned over to the State.

Institutions involved in automobile financing were not satisfied with this state of affairs, and, in 1984, they were successful in persuading the Legislature, through the enactment of 1984 Md.Laws, ch. 549, to provide substantially more protection. Much of the history of this legislation was recounted by the Court of Appeals in *State v. One 1983 Chevrolet Van,* 309 Md. 327, 331–33, 524 A.2d 51 (1987). Judge Orth there noted:

"Automobile dealers were not happy with the 1972 law, and they made their dissatisfaction known. They experienced problems in receiving payments for outstanding amounts on installment agreements when a vehicle had been seized by law enforcement authorities due to its use in connection with controlled dangerous substance crimes. They testified in the committee hearing that the current law provided inadequate notice so that they frequently did not learn of the seizure until months after its occurrence. They asserted that sometimes the State was authorized to hold the vehicle for over a year in police lots where it was damaged by thieves and vandals. They complained that the current law provided that proceeds from forfeited vehicles go to pay government costs for seizure and forfeiture before secured interest debts, and this frequently left insufficient money to pay off the secured interest. They called for legislation to rectify these hardships....

Senate Bill 589 [ch. 549] was in answer to their call."

As introduced, the bill (SB 589) would have done little more, in substance, than to amend § 297(r) to require the court, if it decided that the vehicle should be forfeited and that it was subject to a bona fide recorded security interest, to release the vehicle to the secured party, provided that party agreed not to sell the vehicle to the defendant. The Senate Judicial Proceedings Committee rewrote the bill, however, to give much more sweeping protection to innocent lienholders, and it was the bill as amended in the Senate that eventually passed.

That the purpose of the bill, as amended, was to provide protection to innocent lienholders was made clear in the Committee Report. That Report stated, in relevant part, that "the purpose of this bill was to alleviate the hardship worked on dealerships with a secured interest in a motor vehicle which has been seized and forfeited in connection with drug arrests." The Senate did indeed add a number of provisions to § 297, some for the benefit of innocent owners and some to protect lienholders. Subsection (g), for example, was rewritten to require the State's Attorney, following his independent review, to surrender the vehicle to the owner if he concluded that one

of the exceptions to seizure and forfeiture listed in subsection (f) applied. That was peculiarly for the owner's benefit. For the benefit of both parties, time limits were placed on the filing and adjudication of forfeiture petitions and more specific notice was required to be given to interested persons. In a new subsection (j), the bill carried forth the essence of the initial proposal that, if the court, in a forfeiture proceeding, determined that the vehicle should be forfeited but that it was subject to a bona fide recorded security interest, it would release the vehicle to the secured party so that that party could conduct the sale and apply the proceeds, after defraying the expense of the forfeiture proceeding, to its lien.[2] That, it would seem, was for the special benefit of lienholders.

The new protection to innocent lienholders came not just from changes to § 297, however, but also from new language added to §§ 12–624, 12–625, and 12–626 of the Commercial Law article. It was in this bill that the Legislature, by amending those sections of the Retail Installment Sales Act, first authorized a holder to repossess goods "seized by a police department, bureau, or force," declared that no right of redemption existed in such goods, and provided that, after applying the proceeds to the expenses and to the satisfaction of the lien, the creditor was to remit any balance to the police department that seized the goods rather than to the owner.

The Court of Appeals commented on these provisions added to the Retail Installment Sales Act in *One 1983 Chevrolet Van, supra,* 309 Md. 327, 524 A.2d 51. It regarded it as "plain that the Legislature attempted to achieve its intent in enacting Acts 1984, ch. 549 by harmonizing the motor vehicle forfeiture provisions of Art. 27, § 297 and the default, repossession and redemption provisions regarding Retail Installment Sales in the Commercial Law Article." *Id.* at 336, 524 A.2d 51. That, indeed, is reflected as well in the Senate Report, which

---

**2.** The only significant part of that initial proposal deleted from the bill was the requirement that the secured party agree not to sell the vehicle to the defendant. That, indeed, was the issue and holding in *One 1983 Chevrolet Van.*

pointed out that the Commercial Law article amendments were introduced "to make the Commercial Law article consistent with the Crimes and Punishment article."

The 1984 legislation is what set the stage for the controversy now before us. It is clear that the amendments to § 297 and to the Commercial Law article were intended to be read together, in harmony. The Court of Appeals has so held. The amendments to § 297 directly addressed the concerns expressed by automobile dealers as to notice of seizures and delays in prosecuting forfeitures, but it gave lienholders no right to take possession of the vehicle until such time as a court declared that the vehicle should be forfeited but that it was subject to a bona fide recorded lien. The amendments to §§ 12–624 and 12–625, on the other hand, purported to give a lienholder a right to repossess and sell immediately upon a seizure, whether or not the State elected to proceed with forfeiture.

Some gloss was put on this by further amendments to § 297 added in 1988 (1988 Md.Laws, ch. 586). Through that Act, the Legislature added a new subsection (n)—which in 1989, with some style changes, became subsection (r)—to state, in relevant part that:

"This subtitle may not be construed to prohibit a secured party from exercising its rights under applicable law, including the right to sell a motor vehicle that has been seized under this subtitle, *in the event of a default in the obligation giving rise to the security interest.*"

(Emphasis added.)

If the secured party decided to exercise its right to sell a motor vehicle seized under § 297, it was required to notify the State's Attorney and provide documentation of the lien, whereupon "the motor vehicle shall be released to the secured party." The new language provided further that, after selling the vehicle, the secured party would remit any money that otherwise would be due to the owner to the seizing agency and that, if no forfeiture was ordered, the State would forward that money to the owner.

One purpose of the bill, and the nature of the italicized language quoted above, was explained in the Senate Judicial Proceedings Committee Floor Report. The Committee noted that "[t]his bill allows a secured party to sell a motor vehicle seized for violations of the controlled dangerous substance laws *if the owner of the vehicle is in default on payments.*" (Emphasis added.) It explained that "[u]nder current law, the secured party must wait until the court decides the forfeiture issue" and that the purpose of the bill was "to allow a lender to realize his collateral *if the underlying obligation is in default, without waiting for the completion of the forfeiture.*" (Emphasis added.)

This enactment, as explicated in the Senate Committee Report, makes clear the Legislature's view that the word "seized," as used in §§ 12–624 and 12–625, was *not* to be read literally, and that lienholders, despite the language added in 1984 to the Commercial Law article sections, *did* have to wait until the resolution of a forfeiture proceeding to exercise their right of repossession and sale. If it were otherwise, there would have been no need for the language added as subsection (n)(1), now subsection (r)(1). The 1988 addition represents a legislative decision to avoid that wait only where there is some other default, beyond the mere seizure of the vehicle, in the security agreement. Indeed, it would appear that the legislative intent was to limit that benefit to situations where the debtor was in default because of non-payment.

That view of the statutes, by the body that enacted them, is entitled to great weight. It is also consistent with the overall legislative design. It gives meaning to the language added to the Commercial Law sections by recognizing seizure by the police under § 297 as a ground for repossessing the vehicle without a right of redemption, but only after the court, in a forfeiture proceeding, makes the requisite findings under what is now § 297(k).

We must remember that it is not *every* secured party whose rights are protected, or are deserving of protection. From the beginning, it has been only the rights of *innocent* lienholders

that have received consideration. That was clear in the *Commercial Credit case, supra,* 258 Md. 192, 265 A.2d 748, and it is clear and explicit now. Section 297(k)(2) requires the court to recognize the rights of a lienholder only where it finds that the forfeited property is subject to a valid lien *"created without actual knowledge that the property was being, or was to be, used in violation of this subheading."* (Emphasis added.) To read the Commercial Law sections in isolation, as GMAC would have us do, would eliminate this critical condition and open the door to new conspiracies and illicit schemes for financing the purchase of vehicles used by drug dealers. That is not something we believe the Legislature intended to encourage.

Finally, we note that the harmonious reading we give to § 12–624 and § 297 avoids the question raised by GMAC whether a creditor could repossess and sell, without any right of redemption, when the vehicle has been impounded because of a traffic disruption or parking offense.

For these reasons, we conclude that, as appellant was at all times current in his monthly payments and not otherwise in default of the agreement, GMAC did *not* have the right to repossess and sell the vehicle and that the circuit court erred in dismissing appellant's complaint, at least with respect to the claim for damages.

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS; APPELLEE TO PAY THE COSTS.