993 A.2d 136

**ALCOA CONCRETE & MASONRY, INC.**

v.

**STALKER BROTHERS, INC., et al.**

**No. 2816 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

March 31, 2010.

Ruth S. Alpert, Silver Spring, MD, for Appellant.

John M. Seeberger, Baltimore, MD, for Appellees.

Panel: SALMON, * MATRICCIANI, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

LAWRENCE F. RODOWSKY, Judge (Retired, Specially Assigned).

We are called upon here to construe the Maryland Home Improvement Law (the Act), Maryland Code (1975, 2004 Repl. Vol.), §§ 8–101 through 8–702 of the Business Regulation Article.[1] At issue is whether a home improvement general contractor is contractually obligated to pay a subcontractor who was not licensed under the Act, either at the time of entering into the subcontract or when the subcontract was properly performed, but who was licensed when this suit was brought.[2]

The subcontractor is the appellant, Alcoa Concrete and Masonry, Inc. (Alcoa or the Subcontractor). The general

---

* James P. Salmon, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

1. Unless otherwise noted, all Maryland statutory references are to the 2004 Replacement Volume version of the Act.

2. Section 8–101(o) defines "subcontractor." The term
   "means a person, other than a laborer or supplier of materials, who makes an oral or written agreement with:
   "(1) a contractor to perform all or part of a home improvement contract; or
   "(2) another subcontractor to perform all or part of a subcontract to a home improvement contract."
   Section 8–301(b) requires that, "[e]xcept as otherwise provided in this title, a person must have a subcontractor license or contractor license whenever the person acts as a subcontractor in the State." No exception is applicable here.
   Section 8–601(b) provides, subject to exceptions not applicable here, that "a person may not act or offer to act as a subcontractor in the State unless the person has a contractor license or subcontractor license." Violation is a misdemeanor subject to a fine of up to $1,000 and/or imprisonment not exceeding 30 days for a first offense.

contractor is Stalker Brothers, Inc. (Stalker or the General Contractor), one of the appellees. The other appellees are the principals of Stalker, Robert N. Stalker and Donald C. Stalker (the Brothers). Alcoa initiated this action on September 30, 2008, in the Circuit Court for Montgomery County. Summary judgment was granted to the appellees on a record consisting of Alcoa's complaint, verified by its president, Mario J. Ezequiel, an affidavit by Donald C. Stalker, and a certified record from the Maryland Home Improvement Commission (the HIC) reflecting that Alcoa was first licensed as a contractor by the HIC on March 26, 2008.

The president of Alcoa affirmed that Alcoa and Stalker had done business from 2004 through 2007. In 2004, all of Alcoa's invoices were fully and timely paid. When payments in 2005 became less regular, Stalker promised to pay Alcoa when a building owned by the Brothers was sold, but full payment was not made. Alcoa continued to perform subcontract work for Stalker based on an agreement that the General Contractor would pay Alcoa $1,500 per week against invoices for past work and new work. In November 2006, Alcoa performed the cement and masonry work for Stalker on the "Cahill" job, in which Stalker represented there was sufficient profit to pay Alcoa for that subcontract and for the entire past due balance, but an indebtedness remained. In the summer of 2007, Stalker ceased paying Alcoa entirely.[3] Alcoa claims $53,000 plus interest and attorney's fees. Appellees, through Donald Stalker's affidavit, assert that every subcontract performed by Alcoa for Stalker was "residential home improvement work" in Maryland, *i.e.*, done pursuant to a home improvement contract between the owner(s) of a residence and Stalker. Alcoa does not dispute that statement of fact.

Appellees moved for summary judgment on a number of grounds, but the circuit court granted the motion solely on the

---

**3.** On information and belief, the President of Alcoa alleged that Stalker had been paid in full by the owners of the various jobs on which Alcoa had acted as a subcontractor and that Stalker had represented to those owners that all subcontractors had been paid in full.

ground that the series of subcontracts were illegal and could not be enforced. The circuit court accepted appellees' argument that was based upon a venerable line of Maryland cases dealing with licensing and that is illustrated in the home improvement field principally by *Harry Berenter, Inc. v. Berman*, 258 Md. 290, 265 A.2d 759 (1970). In essence, these cases initially inquire whether the purpose of a business licensing statute is to raise revenue or to protect the public. If the purpose is the former, courts will enforce a contract for compensation for business activity that requires a license, even if made by an unlicensed person. But, if the purpose of the licensing requirement is to protect the public, then the Maryland cases relied upon by the appellees do not enforce contracts made by unlicensed persons who seek compensation for business activity for which a license is required.

*Harry Berenter* applied the latter rule in the home improvement field against a contractor who was unlicensed when he made the home improvement contract with the homeowners on which the claim was based. The contractor could not enforce a mechanic's lien against the improved property, because the license requirement was for the benefit of the public. 258 Md. at 295–96, 265 A.2d at 762–63. Nor could the contractor recover on the basis that the homeowner was unjustly enriched. " 'The court's refusal is not for the sake of the defendant, but because it will not aid such a plaintiff,' " and because to grant that relief would nullify the statute. *Id.* at 296, 265 A.2d at 763 (quoting 2 Restatement, *Contracts* § 598, cmt. a).

Alcoa argues that the rule that distinguishes between revenue and regulation does not apply to the facts here, where the agreement was between two businesses engaged in contracting. The contracts sought to be enforced were not between Alcoa and the various homeowners with whom Stalker had contracted. The Subcontractor notes that the Act defines a home improvement contract as an "agreement between a contractor and owner for the contractor to perform a home improvement." § 8–101(h). Further, a "[c]ontractor means a person, other than an employee of an owner, who performs or

offers or agrees to perform a home improvement for an owner." § 8–101(c). Alcoa posits that the revenue/regulatory cases in Maryland do not involve the contractor/subcontractor relationship so that the issue is whether the General Assembly intended that a subcontract to perform work covered by the Act be branded illegal and unenforceable when an unlicensed subcontractor for a licensed contractor has fully performed. Alcoa answers that question "No," arguing that the Act was not intended to be a shield for contractors to elude paying their just debts.

### *Discussion*

### I.  The Revenue/Regulation Rule

### A.  Maryland Cases

Maryland appellate decisions have applied the revenue/regulation rule in a number of contexts. All of the cases under the Act have dealt with the contractor-owner relationship. The members of the public who were protected by the regulatory licensing requirement were the owners of the home. This Court recently again has held, applying *Harry Berenter*, that a contract between the owner of the improved premises and an unlicensed contractor would not be enforced. *See Baltimore Street Builders v. Stewart*, 186 Md.App. 684, 975 A.2d 271 (2009). The contract was signed by an unlicensed individual in the name of an LLC that did not exist, that was not formed until near the end of the work, and that was never licensed. *Id.* at 688, 975 A.2d at 273. The contract was tainted by illegality despite the fact that a fifty percent owner of the LLC employed a licensed contractor that was proffered to have acted as construction manager on the subject home improvement.

*Donmar Maryland Corp. v. Hawkesworth*, 46 Md.App. 575, 420 A.2d 295 (1980), finding that the Act applies to improvements of mobile homes, held unenforceable a contract between an unlicensed contractor and an owner. Similarly, *Suggs v. State*, 52 Md.App. 287, 449 A.2d 424 (1982), holding that the contractor must be licensed at the time of contracting, af-

firmed convictions of unlicensed persons who made agreements subject to the Act with a number of owners.

In support of their position that contractors are embraced within the "public" that is contemplated by the rule, so that contractors are intended to be protected from unlicensed subcontractors, appellees cite *Snodgrass v. Immler,* 232 Md. 416, 194 A.2d 103 (1963). The case involves the licensing of architects.[4] The plaintiff, who was not licensed as an architect, agreed with an owner to design a building. The owner then agreed with a licensed architect that the latter would employ the plaintiff to design the building, and the owner would pay the licensed architect who, in turn, would pay the plaintiff. When the licensed architect did not pay, the plaintiff sued him on their contract and sued the owner, alleging that he was a third-party beneficiary of the owner-licensed architect contract. The defendants prevailed on an illegal contract defense. Appellees here submit that the plaintiff in *Snodgrass* is analogous to the Subcontractor in the case at bar. That is not our reading of *Snodgrass.* There, the Court held that the owner-licensed architect contract was intended to circumvent the licensing requirement. Under the facts, the plaintiff was in substance, if not in form, the owner's architect and the licensed architect was a mere "strawman." *Id.* at 422, 194 A.2d at 106. Thus, *Snodgrass* is but another case applying the rule between an owner, as the party to be protected, and an unlicensed person with whom the owner, in substance, had agreed.

*Thorpe v. Carte,* 252 Md. 523, 250 A.2d 618 (1969), is similar to *Snodgrass.* A licensed real estate broker contracted with an owner to pay a six percent commission, divided sixty-five percent to the broker and thirty-five percent to the owner's engineers, who were not licensed as real estate brokers. The broker could not recover on that contract with the owner. It was an illegal fee-splitting arrangement. *Id.* at 528, 250 A.2d 618, 250 A.2d at 621. *See also Glaser v. Shostack,* 213 Md.

---

4. Architects who are licensed as such are excepted from the licensing requirements of the Act. § 8–301(d)(4).

383, 388, 131 A.2d 724, 726 (1957) (licensed real estate broker cannot recover against owner on listing contract obtained by broker's unlicensed salesperson). In *Fosler v. Panoramic Design, Ltd.,* 376 Md. 118, 829 A.2d 271 (2003), homeowners sought a declaratory judgment that, under their contract with the unlicensed respondent, the latter acted as a home improvement contractor, so that the contract was unenforceable. The respondent, *inter alia,* was to "bid or negotiate the complete project to individual subcontractors, vendors and suppliers," *id.* at 121, 829 A.2d at 273, and coordinate the subcontractors. The Court, applying principles of primary jurisdiction, held that whether the Act applied to respondent was to be decided first by the HIC.

An earlier Maryland decision on which the Court in *Harry Berenter* placed considerable reliance is *Goldsmith v. Manufacturers' Liability Ins. Co.,* 132 Md. 283, 103 A. 627 (1918). There, the plaintiff, an insurance broker, unlicensed in Maryland when the services were rendered, sued an insurer for commissions on a workers' compensation policy placed with the insurer on behalf of an ammunition manufacturer. The Court affirmed denial of the commission by applying the rule that the licensing statute was for the protection of the public and to prevent improper persons from engaging in the insurance profession. *Id.* at 286, 103 A. at 628. Protection of the public may have a double aspect in the *Goldsmith* context. The protected class certainly included the insured who was paying the commission indirectly through the premium charged by the insurer. The protected class may also include the insurer. *Goldsmith* arose in the era before direct billing by insurers. In 1918 (and later), the broker collected the premium from the insured and remitted to the insurer. Financial integrity of brokers was important to insurers as well as to insureds. Although *Goldsmith* may be viewed as involving an implied in fact contract between two businesses, it is not analogous to the case before us. The money at issue here was not to flow from Alcoa to Stalker; it was supposed to flow from Stalker to Alcoa.

There was an aspect to the statutes considered in *Goldsmith* beyond the requirement for licensing. The Court also cited Maryland Code (1911), Article 23, § 185, which in relevant part, provided:

"No corporation or association ..., whether such person be a licensed broker or otherwise, shall, directly or indirectly, pay, except to ... an insurance broker licensed by the State of Maryland, any commission, reward or rebate in consideration of procuring ... insurance from such company...." [5]

We shall return to this type of statute in our discussion under the heading, "Section 8–315," *infra*.

Our review fails to disclose any Maryland appellate decision directly answering whether the regulatory license rule applied in *Harry Berenter*, declaring unenforceable a home improvement contract between an owner and an unlicensed contractor, applies to a subcontract between a licensed contractor and an unlicensed subcontractor. *Harry Berenter* does recognize that, pursuant to provisions of the Act now found in § 8–501, the failure to comply with certain formal contractual requirements in a home improvement contract does not invalidate the contract. *Harry Berenter*, 258 Md. at 297, 265 A.2d at 763.

The Court of Appeals has applied *Harry Berenter* and the § 8–501 savings clause to reject an illegality defense raised by a homeowner to the claim of the licensed contractor with which the owner was in privity, although the contract was oral and the contractor had received payments prior to signing a written contract. *See Gannon & Son v. Emerson*, 291 Md. 443, 435 A.2d 449 (1981). *See also Citaramanis v. Hallowell*, 328 Md. 142, 613 A.2d 964 (1992) (denying restitution, under Consumer Protection Act, of rent paid to unlicensed landlord who had not been unjustly enriched); *DeReggi Constr. Co. v. Mate*, 130 Md.App. 648, 747 A.2d 743 (2000) (applying substan-

---

**5.** The full text of former Article 23, § 185 demonstrates that another of its purposes was to prohibit rebating. We need not decide whether yet another purpose was protectionism for Maryland based insurance brokers.

tial compliance doctrine to permit mechanics' lien enforcement by contractor of contract with landowners, where, at the time of contracting, contractor had no license under the Montgomery County Custom Homes Protection Act, but was licensed before work began, and where there was no actual injury to landowners); and *Pacific Indemnity Co. v. Whaley,* 560 F.Supp.2d 425, 429, *reconsideration denied,* 572 F.Supp.2d 626 (D.Md.2008) (holding that a subcontractor's lack of a license under the Act does not bar a claim for indemnity or contribution by the contractor in a suit by the homeowner against the contractor, because "the public policy embodied in the [Act] and *Berenter* is to protect the public, not unlicensed contractors").

## B. Other Authorities

The authors of *Corbin on Contracts,* after reviewing the revenue/regulatory rule, state:

"Even when the purpose of a licensing statute is regulatory, courts do not always deny enforcement to the unlicensed party. The statute clearly may protect against fraud and incompetence. Yet, in very many cases the situation involves neither fraud nor incompetence. The unlicensed party may have rendered excellent service or delivered goods of the highest quality. The noncompliance with the statute may be nearly harmless. The real defrauder may be the defendant who will be enriched at the unlicensed party's expense by a court's refusal to enforce the contract. Although courts have yearned for a mechanically applicable rule, most have not made one in the present instance. Justice requires that the penalty should fit the crime. Justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but to repudiating defendants.

"In most cases, the statute itself does not require such forfeitures. The statute fixes its own penalties, usually a fine or imprisonment of a minor character with a degree of discretion in the court. The added penalty of unenforceability of bargains is a judicial creation. In many cases, the

court may be wise to apply this additional penalty. When nonenforcement causes great and disproportionate hardship, a court must avoid nonenforcement."

15 *Corbin on Contracts* § 88.3, at 577–78 (rev. ed. 2003).

The approach espoused by Corbin is illustrated in the contractor-subcontractor relationship by *Dow v. United States u/o Holley,* 154 F.2d 707 (10th Cir.1946). This Miller Act case was brought by the footings subcontractor, Holley, who had not been paid by the general contractor, Dow, on a warehouse construction project at a military airfield in Utah. Holley did not have a contractor's license "[a]t the time the subcontract was entered into and at the time the work was done under it[.]" *Id.* at 710. The Utah statute provided a penalty for acting in the capacity of a contractor without having a license, but no statutory provisions "provide[d] in express language that a contract employing an unlicensed contractor to perform services falling within the field of his trade shall be unenforceable." *Id.* After recognizing the revenue/regulatory rule as the general one, the court held:

"But that general rule does not have application in a case of this kind in which an unlicensed member of a profession or trade seeks to recover from a licensed member for services rendered or labor performed pursuant to a contract entered into by them. *Martindale v. Sha[h]a,* 51 Okl. 670, 151 P. 1019 [(1915)]; *White v. Little,* 131 Okl. 132, 268 P. 221 [(1928)]; *Ferris v. Snively,* 172 Wash. 167, 19 P.2d 942, 90 A.L.R. 278 [(1933)]; *Cf. John E. Rosasco Creameries v. Cohen,* 276 N.Y. 274, 11 N.[E.]2d 908, 118 A.L.R. 641 [(1937)].  Moreover, here the primary contract obligated Dow to construct the buildings, including the excavating for the footings.  He could do all of the work himself or let some of it to subcontractors.  The subcontract let to Holley was illegal, but he has completed the work under it.  The prime contract also has been completed, and Dow has received from the United States payment in full for the buildings, including the amount attributable under such contract to the excavating for the footings.  Both contracts having been completed and Dow having received payment in

full, it would not further the letter or the spirit of the law to allow him to escape liability for the unpaid balance due Holley by asserting the illegality of the subcontract."

*Id.* at 710–11. To the same effect, *see Costello v. Schmidlin,* 404 F.2d 87 (3d Cir.1968) (applying and quoting above passage from *Dow* to sustain claim by engineer, unlicensed in New Jersey, for compensation for consulting services furnished to licensed architect); *Edmonds v. Fehler & Feinauer Constr. Co.,* 252 F.2d 639 (6th Cir.1958) (applying and quoting the above passage from *Dow* to defense raising Kentucky real estate broker licensing statute where sales manager employed by residential real estate developer sought compensation under employment contract).

In *Kennoy v. Graves,* 300 S.W.2d 568 (Ky.App.1957), the suit was brought to recover compensation for services rendered as a consulting engineer by the appellee for the appellant, who defended on the ground that the appellee was unlicensed. In affirming recovery by the appellee, the court relied upon *Dow* and the cases cited therein. The court expressed its agreement with that rationale in the following language:

"The statute involved, and similar ones, are designed to protect the public from being imposed upon by persons not qualified to render a professional service. The reason for the rule denying enforceability does not exist when persons engaged in the same business or profession are dealing at arms length with each other. In the case before us appellant was in a position to know, and did know, the qualifications of appellee. No reliance was placed upon the existence of a license, as presumptively would be the case if appellee was dealing with the general public.

"Some of the cases take the view that the professional employer should be estopped to invoke the statute, and others point out the aspect of unjust enrichment. Without invoking specific equitable principles, it seems to us that the technical requirements of the licensing statute play no part in the determination of just claims between persons in the same business field who have contracted with knowledge of

each other's respective professional qualifications. Appellant had no valid defense to this claim, and the trial court correctly adjudged recovery."

*Id.* at 570.

In *Howell v. Steffey,* 204 A.2d 695 (D.C.App.1964), the plaintiff, a realtor licensed in the District of Columbia, sued a Virginia licensed real estate broker for a share of the commissions on the sale of property in Virginia. The claim was based on a cooperating brokers' agreement. The defense of illegality of this agreement under the Virginia real estate brokers licensing statute was rejected because the purpose of the statute was not violated, inasmuch "as the public is protected by the participation in the transaction of a licensed Virginia broker." *Id.* at 696.

The plaintiff in *Loader v. Scott Constr. Corp.,* 681 P.2d 1227 (Utah 1984), installed aluminum siding and rain gutters on various projects for Scott, as general contractor. The latter sought to justify nonpayment on the ground that the subcontractor did not have his own contractor's license when the work was done. Rejecting this defense, the court said:

> "Scott is presumed to possess expertise in the contracting business. Scott, therefore, is not in need of the protection the licensing statute was intended to provide the lay public. No public policy would be served by allowing Scott to invoke application of the common law rule denying relief to an unlicensed contractor."

*Id.* at 1229. *See also Gene Taylor & Sons Plumbing Co. v. Corondolet Realty Trust,* 611 S.W.2d 572 (Tenn.1981) (allowing unlicensed subcontractor to recover value of work against licensed general contractor, but not against owner).

After the decision in *Harry Berenter,* in which the Court relied in part on the Restatement of Contracts, the American Law Institute adopted Restatement (Second) of Contracts (1981). Section 178 states a more flexible approach to enforceability than the rigid revenue/regulatory dichotomy. Section 178 reads:

"When a Term Is Unenforceable on Grounds of Public Policy

"(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

"(2) In weighing the interest in the enforcement of a term, account is taken of

"(a) the parties' justified expectations,

"(b) any forfeiture that would result if enforcement were denied, and

"(c) any special public interest in the enforcement of the particular term.

"(3) In weighing a public policy against enforcement of a term, account is taken of

"(a) the strength of that policy as manifested by legislation or judicial decisions,

"(b) the likelihood that a refusal to enforce the term will further that policy.

"(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

"(d) the directness of the connection between that misconduct and the term."

■ We find no indication in the Act or in the Maryland cases that a policy of the Act is to protect general contractors from unlicensed subcontractors. Consequently, the fact that the Act is a regulatory measure does not bar Alcoa from recovering on its subcontracts with Stalker.

## II.  Section 8–315

■ Cases of the type reviewed above are ones in which there is a licensing statute that carries civil or criminal penalties for noncompliance. Such statutes do not expressly state that the legislative intent is that contracts made in violation of the licensing requirement are to be declared void.

"The additional penalty of non-enforceability of agreements is a judicial engraftment[.]" *Hiram Ricker & Sons v. Students Int'l Mediation Soc.*, 342 A.2d 262, 267 (Me.1975).

The Act in Maryland, however, contains an additional provision that is relevant to the issue before us. Section 8–315 provides:

**"Payment of compensation;  effect of loss of license.**

"(a) *Payment of compensation.*—Except as otherwise provided in subsection (b) of this section, a contractor or subcontractor may not pay or otherwise compensate another contractor or subcontractor or a salesperson for performing or selling a home improvement unless:

"(1) the person to be paid or compensated is licensed;

"(2) the person to be paid or compensated is not subject to the licensing requirements of this title;  or

"(3) the transaction for which the consideration is to be paid is not subject to this title.

"(b) *Effect of loss of license.*—After the expiration, suspension, or revocation of a license, a person:

"(1) is not relieved of outstanding obligations;  and

"(2) may complete and be paid under a home improvement contract that is made but not performed on the date of the expiration, suspension, or revocation."

Section 8–315 may be compared to the statute involved in *Triple B Corp. v. Brown & Root, Inc.*, 106 N.M. 99, 739 P.2d 968 (1987), under which an unlicensed subcontractor on a construction project was barred from suing the general contractor. The New Mexico licensing statute provided that

" '[n]o contractor shall ... bring or maintain any action in any court of the state for the collection of compensation for the performance of any act for which a license is required by the Construction Industries Licensing Act without alleging and proving that such contractor was a duly licensed contractor at the time the alleged cause of action arose.' " *Id.* at 970.

A similar statute barred suit by an unlicensed subcontractor against the contractor in *Lewis and Queen v. N.M. Ball Sons,*

48 Cal.2d 141, 308 P.2d 713 (1957). The California statute read:

> " 'No person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action in any court of this State for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times during the performance of such act or contract.' "

*Id.* at 717.

Section 8–315 of the Act is considerably more flexible then the above-quoted enactments. Unlike a flat prohibition against any suit to recover compensation by an unlicensed subcontractor, § 8–315(b) permits recovery absent a license. It contemplates a situation in which the subcontractor was licensed at the time of contracting, but, in some fashion, loses the license before the work is completed. Under those circumstances, the General Assembly made clear its intent that the unlicensed subcontractor must complete the work and does not forfeit payment for the work done.[6]

■ Section 8–315(a) contains a prohibition against paying an unlicensed contractor, but the plain language of that prohibition limits its operation to the time when payment under the subcontract is to be made. The General Assembly did not prohibit payment "unless . . . the person to be paid or compensated is licensed" *at the time of contracting and performance.* Stalker's position necessarily adds the italicized words to § 8–315(a)(1). Where the language of the statute is clear and unambiguous, we do not add words in an effort to extend the statute's meaning. *See Walzer v. Osborne,* 395 Md. 563, 572, 911 A.2d 427, 432 (2006); *Stanley v. State,* 390 Md. 175, 184, 887 A.2d 1078, 1083 (2005).

■ Departure from the plain language of § 8–315(a)(1) also violates other rules of statutory construction. Requiring

---

**6.** No similar provision was included in former Article 23, § 185, that was involved in *Goldsmith,* 132 Md. at 286, 103 A. at 628.

the subcontractor to be licensed when the work is performed, in order to be paid for the work, is inconsistent with § 8–315(b). Because the condition for payment for work done by a subcontractor is that the subcontractor be licensed at the time of payment, § 8–315(b) became necessary in order to protect the right to payment for work already done by a subcontractor who lost his home improvement license, even an instant after the subcontract is made. *See* § 8–315(b)(2). On the other hand, if a subcontractor is not licensed at the time of subcontracting, but is licensed at the time any payment is due under the contract, the subcontractor's right to payment is protected by § 8–315(a)(1), because the person to be paid is licensed at the time of payment.

▉ This reading of § 8–315 is also consistent with the general principle that a construction of a statute that would result in a forfeiture is to be avoided whenever possible. *See One 1995 Corvette v. Mayor & City Council of Baltimore,* 353 Md. 114, 139, 724 A.2d 680, 692, *cert. denied,* 528 U.S. 927, 120 S.Ct. 321, 145 L.Ed.2d 250 (1999); *Prince George's County v. Vieira,* 340 Md. 651, 659–60, 667 A.2d 898, 902 (1995); *Commercial Credit Corp. v. State,* 258 Md. 192, 199, 265 A.2d 748, 752 (1970). Further, the obligation under § 8–315 is on the payor, here, Stalker. It is not a reasonable construction of the statute to allow Stalker to withhold payment, now that Alcoa is licensed, on the ground that Alcoa previously was unlicensed when Stalker was violating the Act by making some payments during that period.

From the standpoint of the policy of the Act, it is clear that subcontractors are to be licensed. Section 8–315 effects that policy by making a contractor part of the enforcement program. The requirement that contractors withhold payment until a subcontractor is licensed ferrets out, and causes to be licensed, otherwise unlicensed subcontractors and in that way furthers the Act's aim of protecting homeowners.

Accordingly, we shall reverse the judgment of the Circuit Court for Montgomery County and remand this action for further proceedings, not inconsistent with this opinion.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED AND CASE REMAND-ED.

COSTS TO BE PAID BY THE APPELLEES.