30 A.3d 885

**STALKER BROTHERS, INC., et al.**

v.

**ALCOA CONCRETE MASONRY, INC.**

**No. 57, Sept. Term, 2010.**

Court of Appeals of Maryland.

Oct. 24, 2011.

John M. Seeberger (Law Offices of John M. Seeberger, P.A., Baltimore, MD), on brief, for Petitioners.

Ruth Siegel Alpert (Alpert Law Offices, LLC, Silver Spring, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, *MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

In the Circuit Court for Montgomery County, Alcoa Concrete Masonry, Inc., Respondent, ("Respondent") filed a complaint against Stalker Brothers, Inc., Robert Stalker, and Donald Stalker, Petitioners ("Petitioners"), in which Respondent alleged that it was entitled to a judgment in the amount that Petitioners had agreed to pay for home improvement work that Respondent had performed as a subcontractor for Petitioners. That complaint was dismissed by the Circuit Court, but reinstated by the Court of Special Appeals in *Alcoa Concrete & Masonry, Inc. v. Stalker Brothers, Inc.*, 191 Md. App. 596, 993 A.2d 136 (2010). Petitioners then filed a petition for writ of certiorari, in which they presented this Court with three questions:

■ Whether an unlicensed subcontractor's claim for nonpayment should be honored by a Maryland court in view of more than ninety years of Maryland Court of Appeals precedent refusing to honor claims of unlicensed entities under regulatory licensing requirements[?]

■ Whether the Court of Special Appeals erred in failing to adhere to principles of stare decisis and follow the precedent of the Court of Appeals[?]

Whether the Court of Special Appeals erred in interpreting the Maryland Home Improvement [Law (the Act), Maryland Code (1975, 2004 Repl.Vol.), §§ 8–101 through 8–702 of the Business Regulation Article (BR) ] in a manner inconsistent with Court of Appeals precedent, and in a manner which is internally contradictory[?]

We granted the petition. 415 Md. 41, 997 A.2d 791 (2010). For the reasons that follow, our answer to Petitioners' first

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

question is "yes, when the unlicensed subcontractor's claim is asserted against the general contractor rather than against the homeowner," and our answer to both Petitioners' second and third questions is "no." We shall therefore affirm the judgment of the Court of Special Appeals.

## Background

The complaint at issue includes the following assertions:

3. From 2004 through 2007, Alcoa Concrete and Masonry, Inc. and the Stalker Brothers have been doing business together with the Stalker Brothers acting as General Contractor and Alcoa Concrete and Masonry, Inc. as a subcontractor on select Stalker Brothers construction projects.

4. In 2004, when the Parties began working together, all invoices submitted upon completion of work by Alcoa were paid by the Stalker Brothers in full on a regular basis[.]

5. In 2005, the payments from Stalker Brothers to Alcoa were paid on a less regular basis and/or were not paid in full as they had been at the onset.

6. Complaints from Alcoa to the Stalker Brothers were met with a response that the Stalker Brothers had financial difficulties and when they were resolved and/or a building they personally owned in Gaithersburg was refinanced, all past due invoices would be paid in full.

7. Thus, inasmuch as the Stalker Brothers had, at the onset, kept their word and promises regarding payment of invoices, Plaintiff Alcoa relied on this fact and never used its legal right to place liens on properties where they had done work as a subcontractor to the Stalker Brothers but had not been paid.

8. Furthermore, an agreement whereby Defendants Stalker Bros. would reimburse the Plaintiff Alcoa $1500/week for past due invoices plus all new invoices in full was reached between the parties.

9. In November 2006 Plaintiff Alcoa began working with the Defendants on the Cahill project. Defendant informed Plaintiff that there would be sufficient profit in this project

to pay Plaintiff for all past due invoices plus the invoice for the Cahill job on time. Accordingly, assuming that the Defendant was acting in good faith, Plaintiff Alcoa took no further action to collect on past invoices at that time.

10. As Alcoa began the final work on the Cahill project, the Defendant informed Alcoa that they were closing their business and would be declaring bankruptcy.

11. In summer 2007 the Stalker Brothers stopped paying for both new work and previous invoices.

12. Plaintiff Alcoa immediately contacted Defendant Stalker Brothers who promised that all past work done for their firm would be paid in full when the Gaithersburg building owed [sic] by Robert N. Stalker and Donald C. Stalker was sold.

13. According to information available through the Maryland Department of Assessments and Taxation, a building owned by the Stalker brothers (through Traverse LLC) was sold for the sum of $2,143,000 on or about January 2, 2008.

\*     \*     \*

16. Plaintiff has information and belief that the Defendants signed Releases of Liens with all or some of the businesses and homeowners for whom the Plaintiff worked as a subcontractor for the Defendant and received full payment for work done by Alcoa for Stalker contracts.

17. These Releases of Liens included attestations by the owners of residences or businesses that the work contracted for had been done in a satisfactory manner and, in exchange acknowledgments were signed by Stalker Brothers that all subcontractors had been paid for their work on the projects.

18. The Stalker Brothers, Inc., and the Stalker brothers individually signed these documents knowing full well that they had failed to pay all their subcontractors—including Alcoa Concrete and Masonry, Inc.—and that by falsely signing these documents they were intentionally misrepresenting the facts to the property owners and using these

falsehoods to obtain (and keep funds) that were not their rightful property.

\*     \*     \*

20. Alcoa Concrete has incurred a loss of $53,700 plus interest and attorney's fees as a result of the breach of contract by Stalker Brothers, Inc. and Robert N. Stalker and Donald C. Stalker, individually.

\*     \*     \*

22. Defendants Stalker Brothers accepted money from property owners for work completed by Plaintiff Alcoa and refused to pay Plaintiff Alcoa the money due on the contracts that had been performed by Alcoa as subcontractors on these jobs.

\*     \*     \*

25. Defendant Stalker Brothers intentionally and maliciously committed fraud against Alcoa by continuously promising to make good on past due accounts when they knew hat they had no intention of keeping their promises.
26. Defendant Stalker Brothers intentionally paid invoices and made promises to Alcoa which they knew were untrue in order to coerce the Plaintiff into doing more work for the Defendant which the Defendants had no intention of paying for.

\*     \*     \*

29. It is our information and belief that, irrespective of what the Stalker Brothers alleged, no bankruptcy was ever filed by or for the Stalker Brothers, Inc. and this was another fraudulent act, a subterfuge used by the Stalker Brothers to avoid paying Alcoa monies due for work completed and to try to coerce the Plaintiff into settling on pennies on the dollar rather than the full amount due for work done for the Stalker Brothers, Inc.

Petitioners filed a Motion to Dismiss the complaint, in which they asserted as follows:

3. The work referenced by Plaintiff was residential home improvement work in the State of Maryland.

4. The certified records of the State of Maryland Department of Labor, Licensing and Regulation and the Maryland Home Improvement Commission established that Plaintiff Alcoa . . . "was not licensed as a salesman, sub-contractor or contractor with the Maryland Home Improvement Commission" during the period of 2004 through 2007, and was not licensed at any time prior to March 26, 2008 . . . Plaintiff does not allege otherwise.

5. Notwithstanding its unlicensed status for the period in question, Alcoa Concrete and Masonry, Inc. seeks to enforce an alleged contract or contracts it claims with Defendant Stalker Brothers, Inc. to perform residential home improvement work.

6. The Maryland Courts have made it clear: contracts made by an unlicensed entity such as an unlicensed home improvement contractor or subcontractor (i.e. Alcoa Concrete and Masonry, Inc.), are *"illegal"* *"and will not be enforced."* *Harry Berenter, Inc. v. Berman,* 258 Md. 290, [265 A.2d 759] (1970) (emphasis added); *Donmar Maryland Corporation v. Kenneth Hawkesworth,* 46 Md.App. 575, 420 A.2d 295 (1980); *see also Goldsmith v. Mfrs. Liability I. Co.,* 132 Md. 283, 103 A. 627 (1918); *Snodgrass v. Immler,* 232 Md. 416, 194 A.2d 103 (1963).

(Emphasis in original).

Appended to Petitioners' Motion was a certified letter from the Maryland Home Improvement Commission, attesting that Respondent was not a licensed home improvement contractor, subcontractor, or salesman between 2004 and 2007, or at any time prior to March 26, 2008. As stated above, the Circuit Court granted Petitioners' Motion and dismissed Respondent's complaint.

### Discussion
### I. & II.

■ While reversing the judgment of the Circuit Court, the Court of Special Appeals noted that there is no "Maryland appellate decision directly answering whether the regulatory

license rule applied in *Harry Berenter[, Inc. v. Berman,* 258 Md. 290, 265 A.2d 759 (1970) ], declaring unenforceable a home improvement contract between an owner and an unlicensed contractor, applies to a subcontract between a licensed contractor and an unlicensed subcontractor." 191 Md.App. at 604, 993 A.2d at 140–41. The Court of Special Appeals explained that *Berenter v. Berman* is in

> a venerable line of Maryland cases dealing with licensing and that ... initially inquire whether the purpose of a business licensing statute is to raise revenue or to protect the public. If the purpose is the former, courts will enforce a contract for compensation for business activity that requires a license, even if made by an unlicensed person. But, if the purpose of the licensing requirement is to protect the public, then the Maryland cases relied upon by the appellees do not enforce contracts made by unlicensed persons who seek compensation for business activity for which a license is required.

> *Harry Berenter* applied the latter rule in the home improvement field against a contractor who was unlicensed when he made the home improvement contract with the homeowners on which the claim was based. The contractor could not enforce a mechanic's lien against the improved property, because the license requirement was for the benefit of the public. 258 Md. at 295–96, 265 A.2d at 762–63. Nor could the contractor recover on the basis that the homeowner was unjustly enriched.

191 Md.App. at 600, 993 A.2d at 138.

The Court of Special Appeals summarized Respondent's argument as follows:

> Alcoa argues that the rule that distinguishes between revenue and regulation does not apply to the facts here, where the agreement was between two businesses engaged in contracting. The contracts sought to be enforced were not between Alcoa and the various homeowners with whom Stalker had contracted. The Subcontractor notes that the Act defines a home improvement contract as an "agreement

between a contractor and owner for the contractor to perform a home improvement." § 8–101(h). Further, a "[c]ontractor means a person, other than an employee of an owner, who performs or offers or agrees to perform a home improvement for an owner." § 8–101(c). Alcoa posits that the revenue/regulatory cases in Maryland do not involve the contractor/subcontractor relationship so that the issue is whether the General Assembly intended that a subcontract to perform work covered by the Act be branded illegal and unenforceable when an unlicensed subcontractor for a licensed contractor has fully performed. Alcoa answers that question "No," arguing that the Act was not intended to be a shield for contractors to elude paying their just debts. 191 Md.App. at 598–601, 993 A.2d at 137–139. The Court of Special Appeals agreed with that argument. So do we.

After reviewing Maryland cases applying the "revenue/regulation rule" in other contexts,[1] *Corbin on Contracts*, and

---

1. This review included an analysis of *Snodgrass v. Immler*, 232 Md. 416, 194 A.2d 103 (1963), relied upon by Petitioners. The Court of Special Appeals explained why that reliance is misplaced:

    In support of their position that contractors are embraced within the "public" that is contemplated by the rule, so that contractors are intended to be protected from unlicensed subcontractors, appellees cite *Snodgrass v. Immler*, 232 Md. 416, 194 A.2d 103 (1963). The case involves the licensing of architects. The plaintiff, who was not licensed as an architect, agreed with an owner to design a building. The owner then agreed with a licensed architect that the latter would employ the plaintiff to design the building, and the owner would pay the licensed architect who, in turn, would pay the plaintiff. When the licensed architect did not pay, the plaintiff sued him on their contract and sued the owner, alleging that he was a third-party beneficiary of the owner-licensed architect contract. The defendants prevailed on an illegal contract defense. Appellees here submit that the plaintiff in *Snodgrass* is analogous to the Subcontractor in the case at bar. That is not our reading of *Snodgrass*. There, the Court held that the owner-licensed architect contract was intended to circumvent the licensing requirement. Under the facts, the plaintiff was in substance, if not in form, the owner's architect and the licensed architect was a mere "strawman." *Id.* at 422, 194 A.2d at 106. Thus, *Snodgrass* is but another case applying the rule between an owner, as the party to be protected, and an unlicensed person with whom the owner, in substance, had agreed. 191 Md.App. at 602, 993 A.2d at 139. We agree that *Snodgrass* is not inconsistent with the holding in the case at bar.

opinions of other state and federal appellate courts, the Court of Special Appeals concluded as follows:

We find no indication in the [Maryland Home Improvement Law] or in the Maryland cases that a policy of the Act is to protect general contractors from unlicensed subcontractors. Consequently, the fact that the Act is a regulatory measure does not bar Alcoa from recovering on its subcontract with Stalker.

191 Md.App. at 609, 993 A.2d at 143–144. We agree with that conclusion.

One of the numerous cases cited with approval by the Court of Special Appeals is *Kennoy v. Graves,* 300 S.W.2d 568 (Ky.App.1957), in which the Kentucky Court of Appeals affirmed a judgment in favor of an unlicensed consulting engineer for services rendered to a contractor. While rejecting the contractor's argument that the contract at issue was "void and unenforceable," the *Kennoy* Court stated:

The statute involved, and similar ones, are designed to protect the public from being imposed upon by persons not qualified to render a professional service. The reason for the rule denying enforceability does not exist when persons engaged in the same business or profession are dealing at arms length with each other. In the case before us appellant was in a position to know, and did know, the qualifications of appellee. No reliance was placed upon the existence of a license, as presumptively would be the case if appellee was dealing with the general public.

Some of the cases take the view that the professional employer should be estopped to invoke the statute, and others point out the aspect of unjust enrichment. Without invoking specific equitable principles, it seems to us that the technical requirements of the licensing statute play no part in the determination of just claims between persons in the same business field who have contracted with knowledge of each other's respective professional qualifications.

*Id.* at 570. We agree with that conclusion, which benefits the public by reducing a general contractor's incentive to enter into a contract with an unlicensed subcontractor.

For the reasons stated above, we adopt the analysis of the Court of Special Appeals and hold that the Maryland Home Improvement Law does not render unenforceable a contract between a home improvement general contractor and an unlicensed subcontractor.

## III.

■ The Court of Special Appeals also concluded that, because Respondent's complaint was filed at a point in time when it was a duly licensed contractor within the State of Maryland, the complaint should not have been dismissed. This conclusion was based upon the following interpretation of BR § 8–315:

Unlike a flat prohibition against any suit to recover compensation by an unlicensed subcontractor § 8–315(b) permits recovery absent a license. It contemplates a situation in which the subcontractor was licensed at the time of the contracting, but, in some fashion, loses the license before the work is completed. Under those circumstances, the General Assembly made clear its intent that the unlicensed subcontractor must complete the work and does not forfeit payment for the work done.

Section 8–315(a) contains a prohibition against paying an unlicensed contractor, but the plain language of that prohibition limits its operation to the time when payment under the subcontract is to be made. The General Assembly did not prohibit payment "unless ... the person to be paid or compensated is licensed" *at the time of contracting and performance.* [Petitioners'] position necessarily adds the italicized words to § 8–315(a)(1). Where the language of the statute is clear and unambiguous, we do not add words in an effort to extend the statute's meaning. *See Walzer v. Osborne,* 395 Md. 563, 572, 911 A.2d 427, 432 (2006); *Stanley v. State,* 390 Md. 175, 184, 887 A.2d 1078, 1083 (2005).

Departure from the plain language of § 8–315(a)(1) also violates other rules of statutory construction. Requiring the subcontractor to be licensed when the work is performed, in order to be paid for the work, is inconsistent with § 8–315(b). Because the condition for payment for work done by a subcontractor is that the subcontractor be licensed at the time of payment, § 8–315(b) became necessary in order to protect the right to payment for work already done by a subcontractor who lost his home improvement license, even an instant after the subcontract was made. See § 8–315(b)(2). On the other hand, if the subcontractor is not licensed at the time of the subcontracting, but is licensed at the time any payment is due under the contract, the subcontractor's right to payment is protected by § 8–315(a)(1), because the person to be paid is licensed at the time of payment.

This reading of § 8–315 is also consistent with the general principle that a construction of a statute that would result in a forfeiture is to be avoided whenever possible. *See One 1995 Corvette v. Mayor & City Council of Baltimore,* 353 Md. 114, 139, 724 A.2d 680, 692, *cert. denied,* 528 U.S. 927, 120 S.Ct. 321, 145 L.Ed.2d 250 (1999); *Prince George's County v. Vieira,* 340 Md. 651, 659–60, 667 A.2d 898, 902 (1995); *Commercial Credit Corp. v. State,* 258 Md. 192, 199, 265 A.2d 748, 752 (1970). Further, the obligation under § 8–315 is on the payor, here, Stalker. It is not a reasonable construction of the statute to allow Stalker to withhold payment, now that Alcoa is licensed, on the ground that Alcoa previously was unlicensed when Stalker was violating the Act by making some payments during that period.

From the standpoint of the policy of the Act, it is clear that subcontractors are to be licensed. Section § 8–315 effects that policy by making a contractor part of the enforcement program. The requirement that contractors withhold payment until a subcontractor is licensed ferrets out, and causes to be licensed, otherwise unlicensed subcontractors and in that way furthers the Act's aim of protecting homeowners.

*Id.* at 611–612, 993 A.2d at 144–145. We agree with and adopt that analysis as well.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONERS TO PAY THE COSTS.**